**REALE INTERNATIONAL, INC., Plaintiff,**

v.

**FEDERAL REPUBLIC OF NIGERIA and Central Bank of Nigeria, Defendants.**

**No. 78 Civ. 23–CSH.**

United States District Court, S.D. New York.

Sept. 22, 1982.

Berthold H. Hoeniger, New York City, for plaintiff.

Kissam, Halpin & Genovese, New York City, for defendants; James G. Simms, New York City, of counsel.

HAIGHT, District Judge:

Plaintiff Reale International, Inc. contracted to sell cement to the Government of Nigeria, and thereby became involved, with other cement sellers, in what Circuit Judge Kaufman has described as "one of the most enormous commercial disputes in history," *Texas Trading & Milling Corp. v. Federal Republic of Nigeria,* 647 F.2d 300, 302 (2d Cir.1981), *cert. denied,* 454 U.S. 1148, 102 S.Ct. 1012, 71 L.Ed.2d 301 (1982). The facts giving rise to this and comparable suits by sellers of cement to Nigeria are summarized in *Texas Trading* at 302–306; the Second Circuit held, *inter alia,* that District Judge Pierce (as he then was) acted correctly in sustaining subject matter jurisdiction over these defendants in suits commenced by three other cement sellers who invoked the Foreign Sovereign Immunities Act of 1976 ("FSIA"), 28 U.S.C. § 1330. The plaintiffs in the cases before Judge Pierce were Decor by Nikkei International, Inc.; Chenax Majesty, Inc.; and East Europe Import-Export, Inc.

The procedural history of the case at bar is recounted in *Reale International, Inc. v. Federal Republic of Nigeria,* 647 F.2d 330 (2d Cir.1981). The parties to the present action had stipulated that the jurisdictional issues presented by the case at bar were identical to those pending before Judge Pierce; in order to reduce effort and expense, the parties agreed to be bound by Judge Pierce's jurisdictional decision in the three cases then pending before him. Thereafter repenting of their bargain, the defendants sought to contest subject matter jurisdiction, even after Judge Pierce had sustained it. This Court held defendants to their stipulation, but the Second Circuit, reversing and remanding, held that the stipulation constituted an impermissible consent by the parties to subject matter jurisdiction. "The parties may stipulate as to facts, but that remains crucially distinct from a judicial determination that, upon those facts, a federal court may hear the case." 647 F.2d at 332 (footnotes omitted). Upon remand, my task now is to make "a proper jurisdictional determination under the FSIA," the Second Circuit further observing by way of guidance:

"If the circumstances of this suit are in fact similar to those in the three cases decided by Judge Pierce and affirmed by us today, then Judge Haight, on remand, should find jurisdiction present." *Ibid.*

The facts in the case at bar are distinctly similar to those presented by the three cases before Judge Pierce. Indeed, pertinent jurisdictional facts are virtually identical to those involved in Judge Pierce's *Chenax* case. Accordingly I find that subject matter jurisdiction exists under the FSIA.

Plaintiff Reale, like the plaintiffs involved in *Texas Trading,* was a middleman, purchasing Nigeria-bound cement from others, and making its profit from the differential between what it paid to those others

and to shipowners for ocean carriage, and the purchase price to be paid by Nigeria (Nigeria also being responsible under the contract of sale for any demurrage incurred at the port of discharge). In reliance upon its contract with Nigeria, Reale contracted in turn with a Spanish manufacturer to supply 240,000 metric tons of Portland cement, Reale having contracted under date of March 8, 1975 to sell the same quantity to Nigeria. (The name "Portland" would appear to have international significance in the cement industry.) Reale is a Connecticut corporation. However, as a practical consequence of Reale's dealing with a Spanish cement manufacturer, the Reale/Nigeria contract provided that Nigeria would pay the purchase price of U.S. $14,280,000 by establishing "an Irrevocable, Transferable abroad, Divisible and Confirmed Letter of Credit in favor of the Seller for the total purchase price through Banco de Bilbao of Oviedo, Spain."

In setting up letter of credit arrangements to pay for the cement purchase from Reale, Nigeria followed precisely the same banking procedures described by Circuit Judge Kaufman in *Texas Trading, supra.* That is to say, Nigeria did not establish a "confirmed" letter of credit with the Banco de Bilbao of Spain. Instead, "Nigeria established what it called 'irrevocable' letters of credit with the Central Bank of Nigeria ('Central Bank'), an instrumentality of the Nigerian government, and advised those letters of credit through the Morgan Guaranty Trust Company ('Morgan') of New York." *Texas Trading, supra,* at 304. This arrangement reflected a longstanding relationship between the Central Bank and Morgan Guaranty pursuant to which Morgan Guaranty had on deposit substantial assets belonging to Nigeria.

In the case at bar, this arrangement manifested itself in the following way. The Central Bank telexed instructions to Morgan to "open and advise our confirmed . . . letter of credit in favor of Real [sic] International Inc., 508 Tolland Street, East Hartford, Ct. 06108 USA for the sum of US Dollars $14,280,000 . . . . . . . Credit to be advised through beneficiary's bankers Ban-

co de Bilbao Oviedo Spain." Thereafter Central Bank sent a documentary credit to Morgan, together with a covering letter in which the Central Bank said to Morgan: "In consideration of your advising the credit, please debit our account and advise us accordingly with the amounts of payments effected thereunder . . ." Morgan in turn advised Reale and Banco de Bilbao in Spain "of the establishment by Central Bank of Nigeria, Tinubu Square, Lagos, Nigeria, of their IRREVOCABLE Credit CBN/BO/75/89 in your favor For US dollars 14,280,000.00 . . ." It is clear from the record testimony that, although the documents called for by the letter of credit could be presented to Banco de Bilbao, payment could be effected only by Morgan in New York, to whom Banco de Bilbao would be obliged to transmit the papers presented to obtain payment.

■ That being so, the case clearly falls within the FSIA, 28 U.S.C. § 1605(a)(2), which exempts from the doctrine of sovereign immunity from suit a cause of action based upon:

> " . . . an act outside the territory of the United States in connection with a commercial activity of the foreign state elsewhere and that act causes a direct effect in the United States."

*Texas Trading, supra,* establishes that the transactions underlying the present suit constitute "commercial activity" of the Nigerian government, within the statutory meaning. Reale's cause of action arises from precisely the same pattern of behavior described in *Texas Trading:* overwhelmed by the avalanche of concrete into its ports, Nigeria and the Central Bank gave unilateral instructions to Morgan to stop processing payments under outstanding, advised letters of credit. In the case at bar, the defendants argue that because documents could be presented to the Banco de Bilbao in Spain, their default did not cause "a direct effect in the United States" under § 1605(a)(2). In that regard, the case at bar is said to differ from those before Judge Pierce. It is true that, in two of the

three cases before Judge Pierce, the contracts of sale called for the presentment of documents to banks designated by the plaintiff sellers in the United States. However, the *Chenax* case involved a contract in which the seller named a bank in Hamburg, West Germany as the bank through which the letter of credit was to be made payable. I perceive no difference between *Chenax* and the case at bar. Subject matter jurisdiction having been sustained in *Chenax,* I sustain it here.

That result is also consistent with the broader rationale articulated by Judge Kaufman in *Texas Trading.* His opinion reminds us that courts construing "direct" and "in the United States," as used in the statute, "should be mindful more of Congress' concern with providing 'access to the courts' to those aggrieved by the commercial acts of a foreign sovereign," 647 F.2d at 312. "The question is, was the effect sufficiently 'direct' and sufficiently 'in the United States' that Congress would have wanted an American court to hear the case." *Id.* at 313. Furthermore, important commercial principles as well as congressional intent, are involved. The Second Circuit concluded its opinion in *Texas Trading* thus:

"Our rulings today vindicate more than Congressional intent. They affirm the right of all participants in the marketplace of the world to be treated as equals, and to ascribe to principles of trade which found their birth in the law merchant, centuries ago. Corporations can enter contracts without fear that the defense of sovereign immunity will be inequitably interposed, and foreign states can bargain without paying a premium required by a trader in anticipation of a judgment-proof client. Commerce is fostered, and all interests are advanced." *Id.* at 315–16.

▮ In the case at bar, an American corporation has suffered an anticipatory breach of its contract with Nigeria, that breach having been engineered and implemented by instructions given by the Central Bank to Morgan, the latter's New York correspondent and depository of Nigerian assets, which Nigeria and the Central Bank unilaterally designated as the source for payments under the contract with plaintiff. Under both the facts and the rationale of *Texas Trading,* these circumstances are sufficient to state a cause of action under the FSIA.

I am mindful of the following *dictum* from *Texas Trading,* upon which the defendants rely in the case at bar:

"Whether a failure to pay a foreign corporation in the United States or to pay an American corporation overseas creates an effect 'in the United States' under § 1605(a)(2) is not before us." *Id.* at 312 (footnotes omitted).

I construe the latter phrase to mean an overseas payment by a foreign state to an American corporation in such a manner that does not involve the use of American banking resources. That was not the circumstance presented in *Texas Trading;* no more is it the situation presented by the case at bar. The facts in the case at bar fall squarely within *Texas Trading,* and I hold that plaintiff's cause of action falls within the FSIA, so that this Court has subject matter jurisdiction.

Thus, on remand from the Second Circuit, I hold that subject matter jurisdiction exists in this case.

It is So Ordered.