**William F. CALLEJO, Individually and as Trustee, and Adelfa B. Callejo, as Trustee, Plaintiffs-Appellants,**

v.

**BANCOMER, S.A., Defendant-Appellee.**

**No. 84–1270.**

United States Court of Appeals, Fifth Circuit.

July 8, 1985.
As Corrected July 16, 1985.

Worsham, Forsythe, Samples & Woodridge, Robert K. Wise, Dallas, Tex., for plaintiffs-appellants.

Clark, West, Keller, Butler & Ellis, Mike Tabor, Dallas, Tex., Curtis, Mallet-Prevost, Colt & Mosle, Manuel R. Angulo, New York City, for Bancomer.

Before GOLDBERG, JOHNSON and DAVIS, Circuit Judges.

GOLDBERG, Circuit Judge:

This suit is one of several arising from the promulgation by Mexico of exchange control regulations on August 13, 1982, and from the subsequent nationalization of privately-owned Mexican banks on September 1, 1982. The exchange control regulations mandated that all deposits in Mexican banks, however denominated, be repaid in Mexican pesos at specified rates of change. Because the dollar rate of exchange was well below the market rate, the regulations constituted a Montezuma's revenge on American investors who had dollar deposits in Mexican banks. A number of these indisposed investors, including the plaintiffs in the present suit, have brought claims against Mexican banks for breach of contract.

Thus far, the courts that have passed on these cases have been unanimous in dismissing the plaintiffs' claims, either on the ground that the banks are immune from suit under the doctrine of sovereign immunity, *Braka v. Nacional Financiera*, No. 83–4161 (S.D.N.Y. July 9, 1984); *Frankel v. Banco Nacional de Mexico*, No. 82–6457 (S.D.N.Y. May 31, 1983), or on the ground that suit is barred by the act of state doctrine, *Braka v. Bancomer, S.A.*, 589 F.Supp. 1465 (S.D.N.Y.1984), *aff'd*, 762 F.2d 222 (2d Cir.1985); *Braka v. Multibanco Comermex*, 589 F.Supp. 802 (S.D.N.Y. 1984). In the present case, the district court relied on sovereign immunity, holding that Bancomer is an instrumentality of the Mexican Government, that the Callejos' suit is based on sovereign not commercial activities, and that therefore Bancomer is immune from suit under the Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C.

§§ 1330, 1332(a)(2)–(4), 1391(f), 1441(d), 1602–1611 (1982). Because the district court dismissed the Callejos' claim for lack of jurisdiction, it did not reach the act of state question.

We agree with the result reached by the district court, but disagree with its rationale. We believe that Bancomer is not immune from suit under the FSIA and that the case is properly analyzed in act of state terms. Because we are barred under the act of state doctrine from inquiring into the validity of acts of foreign states performed in their own territory—including the validity of Mexico's exchange control regulations—we affirm the district court's dismissal of the present suit.

## I. FACTS

William Callejo and his wife Adelfa are United States citizens who reside in Texas. Beginning in 1979 or 1980, the Callejos purchased certificates of deposit ("CDs") issued by Bancomer, S.A., a then privately-owned Mexican bank.[1] The record is unclear about how this business relationship originated—in particular, whether it resulted from Bancomer's solicitations in Texas. During the course of the Callejos' relationship with Bancomer, however, Bancomer regularly engaged in commercial activity in the United States, operating a branch office in Los Angeles and an agency in New York City. In Texas, Bancomer maintained accounts with both Republic Bank Dallas and Laredo National Bank.

The procedure used by the Callejos and Bancomer to make deposits and payments, although labyrinthine in course, is fairly clear in broad outline. To make deposits, the Callejos would direct their bank in Dallas to wire funds to Laredo National Bank in Laredo, Texas, where they would be credited to Bancomer's account. Bancomer would then direct Laredo National to debit Bancomer's account in the same amount, and would credit the amount to the Callejos' account at Bancomer's branch in Nue-

vo Laredo, Mexico. To cover this credit by Bancomer to the Callejos' account, Laredo National would transfer the funds (by an undisclosed mechanism) to Bancomer's Nuevo Laredo branch. It is undisputed that Laredo National acted as a correspondent bank in effectuating these deposits, that Bancomer's account with Laredo National did not show a net increase as a result of the transactions, and that the Callejos' money ultimately was deposited in an account in Bancomer's Nuevo Laredo branch, where the certificates of deposit were issued.

The means by which Bancomer paid interest and principal to the Callejos are the subject of somewhat greater dispute. The Callejos claim that Bancomer effectuated the payments by directing Laredo National to draw funds from Bancomer's Laredo National account and to transfer them to the Callejos' bank in Dallas. According to the Callejos, this method of payment was established specifically to ensure that they would receive the payments in Texas rather than Mexico. Bancomer, in contrast, claims that it would issue cashier's checks in Mexico payable to the Callejos and would hold the checks at its Nuevo Laredo branch pending receipt of instructions from the Callejos as to how the funds should be remitted. Usually, the funds would be remitted by means of interbank transfers; on occasion, however, they would be redeposited in Mexico, or would be sent in the form of a cashier's check to a third person, or would be remitted to one of the Callejos' accounts with another Mexican bank. Although these descriptions of the method of payment differ in emphasis, they are not directly contradictory; the payments drawn on Bancomer's account with Laredo National, which the Callejos highlight, were merely one link in a larger chain by which Bancomer transferred funds from its Nuevo Laredo branch to the Callejos' American accounts. As with the method of making deposits, Laredo National's role appears to

---

1. The CDs purchased by the Callejos included both dollar- and peso-denominated certificates. The Callejos bought these certificates on their own behalf and as trustees for undisclosed principals.

have been that merely of a correspondent bank.

The four certificates of deposit at issue in the present suit were purchased by the Callejos on May 31 and June 3, 1982. Two were renewals of prior certificates and two were new certificates; all had terms of three months, were denominated in United States dollars, and called for payment of principal and interest in United States dollars. Together, they had a value of approximately $300,000. Like the other certificates of deposit purchased by the Callejos, they specified on their face Mexico City as the place of payment.

In August 1982, facing a severe monetary crisis brought on by a decline in the world price of oil, the Government of Mexico promulgated exchange control regulations. These were supplemented by further regulations in September 1982. The regulations required Mexican banks to pay principal and interest on U.S. dollar-denominated certificates of deposit in pesos rather than dollars, at a specified rate of exchange.[2] The regulations also required that payment be made in Mexico and limited the number of pesos that foreigners could remove from the country. On September 1, 1982, the Government of Mexico nationalized all privately-owned Mexican banks, including Bancomer.

Pursuant to the new exchange control regulations, on August 13, 1982, Bancomer notified the Callejos that it would pay the principal and interest on the Callejos' four certificates of deposit in pesos at a rate of exchange substantially below the market rate. To forestall this, the Callejos renewed the two certificates of deposit due to

mature on August 31, 1982, and filed the present suit.[3]

As amended, the Callejos' complaint alleged breach of contract and securities act violations[4] and sought either rescission of the sale of the certificates of deposit or money damages. In response, Bancomer filed a motion to dismiss, which the district court granted on February 27, 1984. The district court held that the Callejos' suit was not based on Bancomer's commercial activities and that therefore Bancomer, as an instrumentality of the Mexican Government, was entitled to sovereign immunity. The Callejos then brought the present appeal.

## II. SOVEREIGN IMMUNITY

Along with other privately-owned Mexican banks, Bancomer was nationalized by the Mexican Government on September 1, 1982. Consequently, Bancomer is now an "agency or instrumentality of a foreign state" within the meaning of 28 U.S.C. § 1603(b)(2), and would ordinarily be entitled to immunity from the jurisdiction of American courts under the FSIA, 28 U.S.C. § 1604. The FSIA, however, contains a number of exceptions to the jurisdictional immunity of foreign states. One of these is found in 28 U.S.C. § 1605(a)(2), which states:

> (a) A foreign state shall not be immune from the jurisdiction of courts of the United States or of the States in any case—
>
> ....
>
> (2) in which the action is based [1] upon a commercial activity carried on in the United States by the foreign state; or [2] upon an act performed in

2. The governmentally-established exchange rate was 70 pesos to the dollar for all non-priority transactions. According to the Callejos, the market exchange rate in August 1982 was 114 pesos to the dollar. This rate subsequently rose to more than 130 pesos to the dollar in November 1982.

3. Initially, the Callejos brought this action in the 95th Judicial District Court for Dallas County, seeking money damages. On September 30, 1982, however, Bancomer removed the action,

pursuant to 28 U.S.C. § 1441(d), to the United States District Court for the Northern District of Texas, on the ground that it was an "agency or instrumentality of a foreign state" as defined by the FSIA, 28 U.S.C. § 1603(b).

4. The Callejos claim that Bancomer's failure to register the certificates violated Section 12(1) of the Securities Act of 1933, 15 U.S.C. § 77l(1) (1982) and Section 33A.1 of the Texas Securities Act, Tex.Rev.Civ.Stat.Ann. art. 581–33 A.(1).

the United States in connection with a commercial activity of the foreign state elsewhere; or [3] upon an act outside the territory of the United States in connection with a commercial activity of the foreign state elsewhere and that act causes a direct effect in the United States.[5]

The Callejos claim that this exception applies in the present case, since their suit is based upon a commercial activity by Bancomer that was both carried on and caused a direct effect in the United States.

The FSIA has aptly been called a "remarkably obtuse" document, a "statutory labyrinth that, owing to the numerous interpretive questions engendered by its bizarre structure and its many deliberately vague provisions, has during its brief lifetime been a financial boon for the private bar but a constant bane of the federal judiciary." *Gibbons v. Udaras na Gaeltachta,* 549 F.Supp. 1094, 1105, 1106 (S.D. N.Y.1982), *quoted in Vencedora Oceanica Navigacion v. Compagnie Nationale Algerienne de Navigation,* 730 F.2d 195, 205 (5th Cir.1984) (Higginbotham, J., dissenting). Although the FSIA was intended to introduce uniformity into the process of granting sovereign immunity, *see* H.R.Rep. No. 1487, 94th Cong., 2d Sess. 7, *reprinted in* 1976 U.S.Code Cong. & Ad.News 6604, 6605–06 ("House Report"), Congress, rather than provide explicit direction, paradoxi-

cally put its faith in the courts to develop guidelines on a case-by-case basis. *Texas Trading & Milling Corp. v. Federal Republic of Nigeria,* 647 F.2d 300, 308–09 (2d Cir.1981), *cert. denied,* 454 U.S. 1148, 102 S.Ct. 1012, 71 L.Ed.2d 301 (1982). Thus, while the outer limits of our analysis are defined by the Act itself, the specific path we take must be guided by the general purposes underlying the Act.

■ In determining whether Section 1605(a)(2) applies, two questions are relevant:

(1) Is the Callejos' suit "based upon a commercial activity" by Bancomer?

(2) If so, did this commercial activity have the required jurisdictional nexus with the United States?

In the present case, the district court answered the first of these questions in the negative and therefore never reached the second. It held that the action was "based upon" the promulgation by Mexico of exchange control regulations—a sovereign act—not upon Bancomer's banking activities. We disagree. In our view, the Callejos' action arose as a result of Bancomer's commercial banking activities. Moreover, these banking activities had a direct effect in the United States, thus satisfying the jurisdictional-nexus requirement of Section 1605(a)(2). For these reasons, we hold that Bancomer is not entitled to sovereign immunity under the FSIA.

---

5. Under the FSIA, where an exception to sovereign immunity applies, the federal courts have subject-matter jurisdiction over the dispute. 28 U.S.C. § 1330(a); *see Verlinden B.V. v. Central Bank of Nigeria,* 461 U.S. 480, 103 S.Ct. 1962, 76 L.Ed.2d 81 (1983) (subject-matter jurisdiction over FSIA suits does not depend on diversity of citizenship; instead, FSIA claims fall within the judicial power of the United States because they "arise under" the laws of the United States, *i.e.,* the FSIA itself). Moreover, where subject matter jurisdiction exists and where service of process is made pursuant to 28 U.S.C. § 1608, then personal jurisdiction exists. 28 U.S.C. § 1330(b). As with all suits, however, the exercise of personal jurisdiction must comply with the due process clause. *See Texas Trading & Milling Corp. v. Federal Republic of Nigeria,* 647 F.2d 300, 308 (2d Cir.1981), *cert. denied,* 454 U.S. 1148, 102 S.Ct. 1012, 71 L.Ed.2d 301 (1982).

Here, Bancomer appears to concede that, if subject matter jurisdiction exists, then personal jurisdiction also exists. Although Bancomer initially claimed that the Callejos failed to serve process in compliance with 28 U.S.C. § 1608, the Callejos re-served Bancomer by delivering a summons and a copy of their complaint both to the manager of Bancomer's New York agency and to the Subdirector/General Manager of Bancomer's Los Angeles branch office. On appeal, Bancomer has not reiterated its claim that the Callejos failed to comply with 28 U.S.C. § 1608, nor has it raised as a separate defense the argument that the exercise of personal jurisdiction would violate due process. To the extent that Bancomer contends that there are insufficient contacts for the exercise of personal jurisdiction, *see* Brief for Appellee at 18 n. 12, we hold that the contacts discussed in Part II(B) below are sufficient to satisfy the requirements of due process.

### A. Commercial Activity

■ In determining whether the commercial activity exception applies, the critical question is usually whether the relevant activity is commercial or sovereign in nature—whether it is a *jure gestionis* or a *jure imperii,* a private or a public act.[6] Here, however, there is little doubt about how to characterize the activities at issue: Bancomer's actions in selling the certificates of deposit were clearly commercial in nature, *see Schmidt v. Polish People's Republic,* 579 F.Supp. 23, 26 (S.D.N.Y.), *aff'd,* 742 F.2d 67 (2d Cir.1984); House Report, *supra,* at 6615 ("sale of a service or a product" by a foreign government is commercial in nature), and Mexico's promulgation of the exchange control regulations in response to a national monetary crisis was clearly sovereign, *Braka v. Bancomer, S.A.,* 589 F.Supp. 1465, 1469 (S.D.N.Y. 1984) ("[A] foreign sovereign's internal currency regulation 'is precisely the type of governmental activity that cannot be subjected to judicial scrutiny.' "), *aff'd,* 762 F.2d 222 (2d Cir.1985). The question, instead, is defining with precision which of these activities is the *relevant* activity— that is, the activity on which the Callejos' suit is "based"?

The district courts that have considered this question have given different answers. The court below followed *Frankel v. Banco Nacional de Mexico,* No. 82–6457 (S.D. N.Y. May 31, 1983), in finding that the relevant activity was the promulgation by Mexico of exchange control regulations. As the *Frankel* court noted,

> [P]laintiffs allege no conduct on the part of Banco Nacional in breach of its obligations to plaintiffs other than measures

taken by Banco Nacional to comply with the currency control rules and regulations promulgated by the Mexican Government. It is evident that the gravamen of the complaint, succinctly set forth in paragraph 7 thereof, is as follows (emphasis added):

> .... *That the promulgation of the* ... [currency control] *rules and the prohibition of the defendant paying plaintiffs in United States dollars represents a breach of contract between the parties as specified in the Certificate of Deposit.*

At 5. In contrast, the court in *Braka v. Bancomer* focused on the defendant bank's actions in selling the certificates of deposit:

> Although a foreign sovereign's internal currency regulation "is precisely the type of governmental activity that cannot be subjected to judicial scrutiny," ... the Ministry of Treasury, not Bancomer, was responsible for the exchange controls. The issue under the FSIA is to determine whether the act of the named defendant was performed in a sovereign or a commercial capacity; analysis must focus on the named defendant's acts which are the basis of the action and not on the separate acts of other sovereign instrumentalities or agencies.

589 F.Supp. at 1469. Applying this test, the *Braka* court concluded, "Here, the activity at issue is Bancomer's issuance of CDs to attract time deposits. The act that gave rise to plaintiffs' claim was Bancomer's breach of its contractual obligation to repay the deposit and any interest due in United States dollars." *Id.*

■ We agree with the conclusion of the *Braka* court rather than the conclusion

---

**6.** The FSIA provides little guidance on this issue. The only discussion occurs in 28 U.S.C. § 1603(d), which states:

> A "commercial activity" means either a regular course of commercial conduct or a particular commercial transaction or act. The commercial character of an activity shall be determined by reference to the nature of the course of conduct or particular transaction or act, rather than by reference to its purpose.

While this is helpful so far as it goes, it is somewhat circular, since it defines "commercial activity" in terms of "commercial conduct" and "commercial transaction" but contains no independent definition of "commercial." Generally, however, if an activity is of a type that a private person would customarily engage in for profit, it is clearly commercial. *See Letelier v. Republic of Chile,* 748 F.2d 790, 796–97 (2d Cir.1984); *International Ass'n of Machinists & Aerospace Workers v. OPEC,* 649 F.2d 1354, 1357 (9th Cir. 1981), *cert. denied,* 454 U.S. 1163, 102 S.Ct. 1036, 71 L.Ed.2d 319 (1982); House Report, *supra,* at 6614–15.

reached in *Frankel.* Under the FSIA, sovereign immunity depends on the nature of those acts of the defendant that form the basis of the suit. Here, the act complained of was Bancomer's breach of its contractual obligations to the Callejos, not the promulgation by Mexico of exchange control regulations. *Cf. MOL, Inc. v. People's Republic of Bangladesh,* 736 F.2d 1326, 1328–29 (9th Cir.) (suit based on termination of contract, not on revocation of import license by Bangladesh), *cert. denied,* — U.S. ——, 105 S.Ct. 513, 83 L.Ed.2d 403 (1984). These contractual obligations were commercial in nature; they were of a kind that a private individual would customarily enter into for profit. Indeed, at the time that Bancomer sold the certificates of deposit, it was a private entity and did so as part of its general commercial activities. The fact that Bancomer was later nationalized is, in the current context, irrelevant. Even if Bancomer had remained a private entity, it would have been obligated under Mexican law to breach its contractual obligations to the Callejos. Its actions in doing so were not actions that only a sovereign could perform, but were instead commercial. *Cf. French v. Banco Nacional de Cuba,* 23 N.Y.2d 46, 51, 295 N.Y.S.2d 433, 242 N.E.2d 704 (1968) (pre-FSIA case holding that Cuban central bank not entitled to sovereign immunity, where central bank breached contractual obligation to pay plaintiff in U.S. dollars in compliance with Cuban exchange control regulations).

Bancomer nevertheless contends that the Callejos' suit was based upon the Mexican exchange regulations since, but for these regulations, it would not have breached the terms of the CDs and the Callejos' suit would not have arisen. We do not read Section 1605(a)(2)'s "based upon" requirement, however, to be equivalent merely to a requirement of causation. In most in-

stances, a suit results from a variety of factors; it is no more the result of a single cause than was the Civil War. To say that the commercial activity exception does not apply whenever a suit is caused by a sovereign act would, in large measure, read the exception out of the law. We believe, instead, that the focus should be on the elements of the cause of action itself: Is the gravamen of the complaint a sovereign activity by the defendant? Here, the answer is clearly no: The activities of Bancomer that are the basis of the Callejos' complaint—the sale of the certificates of deposit and the subsequent payments in pesos rather than dollars—were commercial in nature.[7]

Nor does Bancomer acquire any derivative immunity by virtue of the fact that, in breaching the terms of the certificates of deposit, it was merely complying with the sovereign decrees of the Mexican Government. In *Arango v. Guzman Travel Advisors Corp.,* 621 F.2d 1371 (5th Cir.1980), we rejected this view of derivative immunity. There, the plaintiffs brought breach of contract, negligence, battery, and false imprisonment claims against the Dominican national airline after they had been denied entry as vacationers into the Dominican Republic. We held that the airline was not entitled to sovereign immunity on the breach of contract and tort claims, even though, in breaching the tour contract, it was merely complying with the government's sovereign decision to exclude the plaintiffs. *Id.* at 1379–80. Instead, the airline was entitled to sovereign immunity only on the battery and false imprisonment claims, where it had acted "as an arm or agent of the Dominican government." *Id.* at 1379. The airline acquired immunity not derivately from the government's sovereign acts, but only by participating directly

7. This interpretation is supported by the language of § 1603(d), that "[t]he commercial character of an activity shall be determined by reference to [its] *nature* ... rather than by reference to its *purpose.*" (Emphasis added). Here, the nature of Bancomer's breach of contract was commercial even though its purpose was to comply with the sovereign decrees of the Mexi-

can Government. *Cf. Arango v. Guzman Travel Advisors Corp.,* 621 F.2d 1371, 1379–80 (5th Cir. 1980) (holding that commercial activity exception applied to plaintiff's contract claim, even though suit arose as a result of Dominican Republic's sovereign decision to deny plaintiffs entry).

in those acts—that is, by acting as a sovereign itself. In the present case, Bancomer did not act as an agent of the Mexican Government in implementing the exchange regulations; instead, it acted as any private party would in complying with the law. As the *Braka* court noted,

> [Bancomer] was not the central bank and it had no special role in effectuating the monetary controls beyond complying with the decrees. Bancomer's act in paying pesos instead of dollars was not 'peculiarly within the realm of government,' ... and its breach was no more a sovereign act than that of any other debtor, private or public, that had contracted to repay in dollars rather than pesos. That it was prevented from complying with its contract by a governmental decree flatly prohibiting the use of dollars as legal tender does not make it immune from suit as an agent of the Republic of Mexico.

589 F.Supp. at 1470.

Because we hold that Bancomer's activities were neither themselves sovereign nor entitled to derivative immunity by virtue of being compelled by Mexican law, we conclude that the district court erred in dismissing the suit on the ground that the suit was based on sovereign, not commercial, activity. We therefore turn to the other prong of Section 1605(a)(2): that the com-

mercial activity have the required jurisdictional nexus with the United States.

### B. Jurisdictional Nexus

■ Section 1605(a)(2) grants an exception from sovereign immunity for suits based upon a commercial activity by an instrumentality of a foreign state, but only if the commercial activity had a sufficient connection with the United States. Section 1605(a)(2) identifies three such connections:

(1) commercial activity carried on in the United States;

(2) commercial activity carried on outside the United States, with acts performed in the United States in connection with that activity; and

(3) commercial activity carried on outside the United States that has direct effects in the United States.

The Callejos claim that Bancomer's commercial activities were carried on and had direct effects in the United States, and that therefore the first and third of these jurisdictional bases exist. We agree with the latter claim—namely, that the breach of the certificates of deposit had direct effects in the United States—and therefore do not address whether Bancomer's activities in connection with the certificates were "carried on in the United States" within the meaning of the FSIA.[8]

---

8. Although the facts necessary to determine that the breach had direct effects in the United States are undisputed, this is not true of the question of whether the activities on which the suit is based were "carried on in the United States." The fact that Bancomer does business in the United States is insufficient to support a finding of jurisdiction under the first clause of § 1605(a)(2). *Vencedora Oceanica Navigacion v. Compagnie Nationale Algerienne de Navigation,* 730 F.2d 195, 202 (5th Cir.1984). Instead, Bancomer's commercial activities in the United States must have a nexus with the act complained of in this lawsuit. *Id.* A defendant's general business activities in the forum may be sufficient to establish his "presence" for purposes of personal jurisdiction, but they are insufficient to establish the contacts necessary for the exercise of jurisdiction under the FSIA. *Harris v. VAO Intourist,* 481 F.Supp. 1056, 1059–61 (E.D.N.Y.1979). In the present case, it is unclear whether the acts complained of grew

out of Bancomer's commercial activities within the United States. On the one hand, Bancomer utilized the services of American correspondent banks and the U.S. mails, and placed telephone calls to the Callejos in Texas regarding the purchase and renewal of the CDs. On the other hand, Bancomer does not appear to have advertised or otherwise solicited business in the United States in connection with the sale of the certificates. *Cf. Wolf v. Banco Nacional de Mexico,* 739 F.2d 1458, 1460 (9th Cir.1984) (holding that where plaintiff purchased CDs as a result of defendant's advertisements in the U.S., the sale of the CDs was a commercial activity carried on in the U.S.), *cert. denied,* — U.S. —, 105 S.Ct. 784, 83 L.Ed.2d 778 (1985). Given the undeveloped state of the record and the fact that we need not reach this issue, we express no opinion about what activities in the United States would be sufficient to satisfy the first clause of § 1605(a)(2).

Determining whether a commercial activity abroad has a "direct effect in the United States" is "an enterprise fraught with artifice." *Texas Trading & Milling Corp. v. Federal Republic of Nigeria*, 647 F.2d 300, 312 (2d Cir.1981), *cert. denied*, 454 U.S. 1148, 102 S.Ct. 1012, 71 L.Ed.2d 301 (1982). "The question is, was the effect sufficiently 'direct' and sufficiently 'in the United States' that Congress would have wanted an American court to hear the case? No rigid parsing of § 1605(a)(2) should lose sight of that purpose." *Id.* at 313.

The legislative history of the FSIA directs us to look to Section 18 of the Restatement (Second) of Foreign Relations Law of the United States (1965), when interpreting the "direct effects" clause. House Report, *supra*, at 6618. This section governs the extent to which American law may be applied to conduct overseas, and states that the conduct must have a "substantial" effect in the United States "as a direct and foreseeable result of the conduct outside the territory" of the United States. Restatement, *supra*, at § 18(b)(ii)–(iii).[9] In several cases where an American plaintiff was injured overseas, this rule has been held to preclude recovery, since the effects in the United States, although potentially substantial, were not "direct and foreseeable." *E.g., Australian Government Aircraft Factories v. Lynne*, 743 F.2d 672, 674–75 (9th Cir.1984), *cert. denied*, — U.S. —, 105 S.Ct. 1189, 84 L.Ed.2d 335 (1985); *Harris*, 481 F.Supp. at 1065; *Upton v. Empire of Iran*, 459 F.Supp. 264, 266 (D.D.C.1978), *aff'd mem.*, 607 F.2d 494 (1979). In these cases, the contacts with the United States were purely fortuitous in that they depended solely on the fact that the injured persons happened to be American. *Cf. Maritime International Nominees Establishment v. Republic of Guinea*, 693 F.2d 1094, 1111

(D.C.Cir.1982) (financial effects on U.S. company fortuitous, since not contemplated in original agreement that U.S. company would share in profits), *cert. denied*, — U.S. —, 104 S.Ct. 71, 78 L.Ed.2d 84 (1983).

However, where the effects in the United States of an activity abroad are less fortuitous, courts have been much more willing to characterize them as "direct." For example, nonpayment of a note payable in the United States to a United States company has been held to cause a direct effect in the United States for the purposes of Section 1605(a)(2). *Texas Trading*, 647 F.2d at 312; *Exchange National Bank v. Empresa Minera del Centro del Peru*, 595 F.Supp. 502, 505 (S.D.N.Y.1984); *Schmidt v. Polish People's Republic*, 579 F.Supp. 23, 27 (S.D.N.Y.), *aff'd*, 742 F.2d 67 (2d Cir.1984); *Goodsons & Co. v. Federal Republic of Nigeria*, 558 F.Supp. 1204, 1206 (S.D.N.Y. 1983); *Reale International, Inc. v. Federal Republic of Nigeria*, 562 F.Supp. 54, 56 (S.D.N.Y.1982). Similarly, a demand for payment on a letter of credit issued by an American bank has been held to have a direct effect in the United States since it causes a depletion of funds in the American bank. *Harris Corp. v. National Iranian Radio & Television*, 691 F.2d 1344, 1351 (11th Cir.1982); *see also Wyle v. Bank Melli*, 577 F.Supp. 1148, 1158–59 (N.D.Cal. 1983) (financial loss to American plaintiffs sufficient to constitute a direct effect in the United States).

Here there is considerable controversy over where the certificates of deposit were payable. The Callejos claim that the place of payment was Texas, where they received the funds; Bancomer claims that it was Mexico, as specified on the certificates themselves. In the present context, however, the question of whether there was a

---

**9.** Although we agree with the *Texas Trading* court that Congress's reference to § 18 is "a bit of a *non sequitur*" since that section relates to the extraterritorial effect of American substantive law, not to the extraterritorial jurisdictional reach of American courts, 647 F.2d at 311, we nonetheless view § 18 as evidence of Congressional intent. *Accord Maritime Int'l Nominees Establishment v. Republic of Guinea*, 693 F.2d 1094, 1110–1111 (D.C.Cir.1982) (applying § 18 in FSIA suit), *cert. denied*, — U.S. —, 104 S.Ct. 71, 78 L.Ed.2d 84 (1983); *Harris*, 481 F.Supp. at 1063 (same).

direct effect in the United States can be resolved without reference to the place of payment. Since the Callejos were located in the United States, the effects of Bancomer's breach[1] were inevitably felt by them there. Moreover, these effects in the United States were foreseeable. Unlike the cases where an American was injured abroad, here the fact that effects were felt in the United States was not fortuitous. Bancomer had engaged in a regular course of business conduct with the Callejos over a several-year period. It was well-aware that it was dealing with American investors—it called them in the United States, mailed the certificates to them there, and remitted payments through an American correspondent bank. Given these factors, we do not perceive any material difference whether the legal place of payment was Mexico or the United States. In either case, Bancomer's breach was closely and foreseeably tied to the effects felt by the Callejos in the United States.

Our conclusion that the place of payment is not decisive is supported by the policies underlying the FSIA. The doctrine of sovereign immunity is one of a number of doctrines that attempt to regulate the relations between sovereign states. The essence of sovereignty is supremacy of authority—one sovereign rarely likes to be told what to do by another. Consequently, the exercise of jurisdiction over a foreign state is, as Chief Justice Marshall recognized when introducing the doctrine of sovereign immunity into American jurisprudence, a "delicate and important inquiry." *Schooner Exchange v. McFaddon,* 11 U.S. (7 Cranch) 116, 3 L.Ed. 287 (1812). By declining to exercise jurisdiction over foreign states where the activities in question either are sovereign in nature or have an insufficient connection with the United States, the United States recognizes that its interest in providing a forum for litigation by aggrieved parties must often yield to the foreign state's interest in its independence. Where either the foreign state's interest in independence is great or the United States's interest in asserting jurisdiction is weak, the FSIA grants sovereign immunity in order to serve our larger interest in preserving international amity.

In weighing these competing interests, arcane doctrines regarding the place of payment are largely irrelevant. In the ever more complex world of international banking, these doctrines doubtless serve a useful function. However, in ordering relations between sovereign states, a larger perspective is appropriate. As the court in *Texas Trading* noted, "Congress in writing the FSIA did not intend to incorporate into modern law every ancient sophistry concerning 'where' an act or omission occurs. Conduct crucial to modern commerce—telephone calls, telexes, electronic transfers of intangible debits and credits—can take place in several jurisdictions. Outmoded rules placing such activity 'in' one jurisdiction or another are not helpful here." 647 F.2d at 311 n. 30.

▇▇▇▇ In the present case, we fail to perceive why jurisdiction should not be exercised.[10] Mexico's interest is not so great—the suit is based on commercial not sovereign acts—nor America's interest so weak—Bancomer had engaged in a longstanding business relationship with residents of the United States which caused them substantial financial harm—that the United States must defer to Mexico. Under these circumstances, we believe that Section 1605(a)(2) applies and that jurisdiction is consequently not barred by sovereign immunity.

## III. ACT OF STATE[11]

▇▇▇▇ Like the doctrine of sovereign immunity, the act of state doctrine springs

---

**10.** In the sovereign immunity arena, we start from a premise of jurisdiction. Where jurisdiction would otherwise exist, sovereign immunity must be pleaded as an affirmative defense; it is not presumed. *Vencedora Oceanica,* 730 F.2d at 199; *Arango v. Guzman Travel Advisors Corp.,*

621 F.2d 1371, 1378 (5th Cir.1980); House Report, *supra,* at 6616.

**11.** Although normally we do not consider issues not passed upon below, *Singleton v. Wulff,* 428 U.S. 106, 120, 96 S.Ct. 2868, 2877, 49 L.Ed.2d

"from the thoroughly sound principle that on occasion individual litigants may have to forgo decision on the merits of their claims because the involvement of the courts in such a decision might frustrate the conduct of the Nation's foreign policy." *First National City Bank v. Banco Nacional de Cuba,* 406 U.S. 759, 769, 92 S.Ct. 1808, 1814, 32 L.Ed.2d 466 (1972); *see also Banco Nacional de Cuba v. Sabbatino,* 376 U.S. 398, 438, 84 S.Ct. 923, 945, 11 L.Ed.2d 804 (1964) (act of state doctrine "shares with the immunity doctrine a respect for sovereign states").[12] Thus, in considering the act of state issue, we traverse much of the same path that we did in the sovereign immunity context—again, our focus is on preventing friction with coequal sovereigns. However, if the Foreign Sovereign Immunities Act is a tangled web of statutory ambiguities, the act of state doctrine is an airy castle. Rather than narrowly focusing on the status of the act and actor complained of, we examine more generally the underlying acts of the foreign state. In the act of state context, even if the defendant is a private party, not an instrumentality of a foreign state, and even if the suit is not based specifically on a sovereign act, we nevertheless decline to decide the merits of the case if in doing so we would need to judge the validity of the public acts of a sovereign state performed within its own territory. *Sabbatino,* 376 U.S. at 428, 84 S.Ct. at 940; *Compania de Gas de Nuevo Laredo v. Entex, Inc.,* 686 F.2d 322,

325–26 (5th Cir.1982) (applying act of state doctrine in suit between private parties), *cert. denied,* 460 U.S. 1041, 103 S.Ct. 1435, 75 L.Ed.2d 794 (1983); *Tabacalera Severiano Jorge, S.A. v. Standard Cigar Co.,* 392 F.2d 706 (5th Cir.) (same), *cert. denied,* 393 U.S. 924, 89 S.Ct. 255, 21 L.Ed.2d 260 (1968).

The act of state doctrine received its classic expression in *Underhill v. Hernandez,* 168 U.S. 250, 18 S.Ct. 83, 42 L.Ed. 456 (1897):

> Every sovereign state is bound to respect the independence of every other sovereign state, and the courts of one country will not sit in judgment on the acts of the government of another, done within its own territory. Redress of grievances by reason of such acts must be obtained through the means open to be availed of by sovereign powers as between themselves.

*Id.* at 252, 18 S.Ct. at 84. As elaborated in *Sabbatino,* the basis of the doctrine is not jurisdictional but prudential. 376 U.S. at 421–423, 84 S.Ct. at 936–38; *see also Ricaud v. American Metal Co.,* 246 U.S. 304, 309, 38 S.Ct. 312, 314, 62 L.Ed. 733 (1918). Under the doctrine, the courts exercise jurisdiction but decline to decide certain issues. *Arango v. Guzman Travel Advisors Corp.,* 621 F.2d 1371, 1380 (5th Cir.1980) (act of state doctrine "operates as an issue preclusion device, foreclosing judi-

826 (1976), it is within our discretion to do so, *id.* at 121, 96 S.Ct. at 2877; *Texas v. United States,* 730 F.2d 339, 358 n. 35 (5th Cir.), *cert. denied,* — U.S. ——, 105 S.Ct. 267, 83 L.Ed.2d 203 (1984). Here, Bancomer raised the act of state issue in its motion to dismiss, and the issue was fully argued by both sides before the district court and on appeal. Because resolution of the act of state issue does not depend on any disputed issues of fact, we believe that it is ripe for decision.

**12.** The exact relation between the sovereign immunity and act of state doctrines has been the source of considerable controversy. Prior to *Sabbatino,* it was often thought that the act of state doctrine was based on the doctrine of sovereign immunity. *See Oetjen v. Central Leather Co.,* 246 U.S. 297, 303, 38 S.Ct. 309, 311, 62 L.Ed. 726 (1918); *Underhill v. Hernandez,*

168 U.S. 250, 252, 18 S.Ct. 83, 84, 42 L.Ed. 456 (1897). *See generally* Note, *Rehabilitation and Exoneration of the Act of State Doctrine,* 12 N.Y.U.L.J. Int'l L. & Pol. 599, 600–10 (1980) (early history of doctrine). *Sabbatino,* however, rejected this notion, grounding the act of state doctrine in prudential rather than jurisdictional terms. 376 U.S. at 421–23, 438, 84 S.Ct. at 936–38, 945; *see also* Restatement (Second) of Foreign Relations Law of the United States § 41 comment e, at 128–29 (1965). *But cf. Alfred Dunhill of London, Inc. v. Republic of Cuba,* 425 U.S. 682, 705 n. 18, 96 S.Ct. 1854, 1866 n. 18, 48 L.Ed.2d 301 (1976) (plurality opinion). Consequently, passage of the FSIA has not superseded the act of state doctrine. *International Ass'n of Machinists & Aerospace Workers v. OPEC,* 649 F.2d 1354, 1359 (9th Cir.1981), *cert. denied,* 454 U.S. 1163, 102 S.Ct. 1036, 71 L.Ed.2d 319 (1982).

cial inquiry into the validity or propriety of ... acts [of a foreign government] in litigation between any set of parties").

In essence, the act of state doctrine operates as a super-choice-of-law rule, requiring that foreign law be applied in certain circumstances. *Occidental of Umm al Qaywayn, Inc. v. A Certain Cargo of Petroleum Laden Aboard the Tanker Dauntless Colocotronis,* 577 F.2d 1196, 1200 n. 4 (5th Cir.1978), *cert. denied,* 442 U.S. 928, 99 S.Ct. 2857, 61 L.Ed.2d 296 (1979); Henkin, *Act of State Today: Recollections in Tranquility,* 6 Colum. J. Transnat'l L. 175, 178–80 (1967). Normally, a court will only apply foreign law if it is compatible with the public policy of the forum. *See* Restatement (Second) of Conflict of Laws § 90 (1971). The act of state doctrine recognizes, however, that in the international context, refusing to enforce foreign law because it is contrary to U.S. conceptions of public policy is unduly parochial and is likely to insult the foreign sovereign, thereby embarassing the foreign policy of the United States.[13] As the Supreme Court noted in *Oetjen v. Central Leather Co.,* 246 U.S. 297, 38 S.Ct. 309, 62 L.Ed. 726 (1918), the act of state doctrine

> rests at last upon the highest considerations of international comity and expediency. To permit the validity of the acts

of one sovereign state to be re-examined and perhaps condemned by the courts of another would very certainly "imperil the amicable relations between governments and vex the peace of nations."

*Id.* at 303–04, 38 S.Ct. at 311.[14]

In the present case, Bancomer claims that Mexico's promulgation of exchange control regulations constituted an act of state, and that consideration of the Callejos' claims would require us to inquire into the validity of those regulations. The Callejos argue, in response, that the act of state doctrine is inapplicable for three reasons: (1) Mexico's promulgation of the exchange control regulations was a commercial act, not an act of state; (2) the "treaty exception" to the act of state doctrine applies, since the exchange control regulations violate Mexico's obligations under the Articles of Agreement of the International Monetary Fund; and (3) the situs of the certificates of deposit was Texas rather than Mexico, and therefore the certificates are not governed by the Mexican decrees. We consider each of these arguments in turn.

### A. The Commercial Activity Exception

▉ In Part III of *Alfred Dunhill of London, Inc. v. Republic of Cuba,* 425 U.S. 682, 96 S.Ct. 1854, 48 L.Ed.2d 301 (1976), a

---

**13.** Although the act of state doctrine is not prescribed by international law, *Sabbatino,* 376 U.S. at 421–22, 84 S.Ct. at 937, most other nations have shown a similar solicitude for the feelings of their fellow states. *See* Restatement (Revised) of Foreign Relations Law of the United States § 469 reporters' note 12 (Tent. Draft No. 6, 1985).

**14.** The act of state doctrine rests in part on separation of power principles. "It is ... buttressed by judicial deference to the exclusive power of the Executive over conduct of relations with other sovereign powers and the power of the Senate to advise and consent on the making of treaties." *First Nat'l City Bank,* 406 U.S. at 765, 92 S.Ct. at 1812. "[I]ts continuing vitality depends on its capacity to reflect the proper distribution of functions between the judicial and political branches of the Government on matters bearing upon foreign affairs." *Sabbatino,* 376 U.S. at 427–28, 84 S.Ct. at 940. However, although the doctrine has "constitutional underpinnings," in *Sabbatino* the Court

held that it is not required by the Constitution. *Id.* at 423, 84 S.Ct. at 938; *cf. Occidental of Umm al Qaywayn,* 577 F.2d at 1200 n. 4 (better view is that doctrine constitutionally compelled). This has produced a continuing controversy concerning whether the doctrine can be waived by the executive branch or is mandatory. *Compare First Nat'l City Bank,* 406 U.S. at 767–769, 92 S.Ct. at 1813–14 (plurality opinion) (applying *Bernstein* exception, under which act of state doctrine does not apply when executive states that application of the doctrine would not advance the interests of American foreign policy) *with id.* at 787–89, 92 S.Ct. at 1823–24 (Brennan, J., dissenting) (interpreting act of state doctrine in terms of nonjusticiability, under which validity of act of foreign state is political question). We need not decide here which of these conflicting interpretations to follow—the interpretation based on judicial deference or on judicial incompetence—since the executive has not expressed any desire in this case that the act of state doctrine not be applied.

plurality of the Court enunciated a commercial activity exception to the act of state doctrine.[15] *Id.* at 695–706, 96 S.Ct. at 1861–67; *cf. Texas Trading & Milling Corp. v. Federal Republic of Nigeria,* 647 F.2d 300, 316 n. 38 (2d Cir.1981) (declining to apply act of state doctrine to Nigeria's breach of cement-purchase contracts), *cert. denied,* 454 U.S. 1148, 102 S.Ct. 1012, 71 L.Ed.2d 301 (1982). This exception states that the act of state doctrine does not apply to "the repudiation of a purely commercial obligation owed by a foreign sovereign or by one of its commercial instrumentalities." *Dunhill,* 425 U.S. at 695, 96 S.Ct. at 1861. The plurality saw the exception as a corollary of the commercial activity exception to the sovereign immunity doctrine, with similar policy justifications.[16] *Id.* at 705–06 & n. 18, 96 S.Ct. at 1866–67 & n. 18. As the

plurality noted, "[T]he mere assertion of sovereignty as a defense to a claim arising out of purely commercial acts by a foreign sovereign is no more effective if given the label 'Act of State' than if it is given the label 'sovereign immunity.' " *Id.* at 705, 96 S.Ct. at 1866.

In the present case, we need not decide whether to adopt the commercial activity exception, since Mexico's actions were clearly sovereign and not commercial in nature.[17] For act of state (as opposed to sovereign immunity) purposes, the relevant acts are not merely those of the named defendants, but any governmental acts whose validity would be called into question by adjudication of the suit. Here, although the specific act complained of by the Callejos was Bancomer's breach of con-

**15.** Only four judges joined in this part of the Court's opinion. The majority decided the case on the ground that Cuba's actions in repudiating a commercial debt were not invested with the sovereign authority of the state and hence were not acts of state at all. *Id.* at 694–95, 96 S.Ct. at 1861. As the Court noted, "No statute, decree, order, or resolution of the Cuban Government itself was offered in evidence indicating that Cuba had repudiated its obligations in general or any class thereof or that it had as a sovereign matter determined to confiscate the amounts due three foreign importers." *Id.* at 695, 96 S.Ct. at 1861. Here, there is no question that Mexico's promulgation of the exchange control regulations was invested with the sovereign authority of the state. The decrees announcing the imposition of the controls were issued by the Mexican Ministry of Treasury and Public Credit and by President Lopez Portillo, and were later reiterated in legislative enactments.

**16.** Writing for the plurality, Justice White justified the commercial activity exception by stating, "[S]ubjecting foreign governments to the rule of law in their commercial dealings presents a much smaller risk of affronting their sovereignty than would an attempt to pass on the legality of their governmental acts. In their commercial capacities, foreign governments do not exercise powers peculiar to sovereigns. Instead, they exercise only those powers that can also be exercised by private persons. Subjecting them in connection with such acts to the same rules of law that apply to private citizens is unlikely to touch very sharply on 'national nerves.' " *Id.* at 703–04, 96 S.Ct. at 1866.

**17.** The articulation in *Dunhill* of a commercial activity exception to the act of state doctrine has engendered considerable debate. *Compare In-*

*ternational Ass'n of Machinists & Aerospace Workers v. OPEC,* 649 F.2d 1354, 1360 (9th Cir.1981) (declining to adopt commercial activity exception), *cert. denied,* 454 U.S. 1163, 102 S.Ct. 1036, 71 L.Ed.2d 319 (1982) *with* Note, *Foreign Sovereign Immunity and Commercial Activity,* 83 Colum.L.Rev. 1440, 1445–51 (1983) (arguing in favor of commercial activity exception).

Although we have cited *Dunhill* on a number of occasions, *see Compania de Gas de Nuevo Laredo v. Entex, Inc.,* 686 F.2d 322, 326 (5th Cir.1982), *cert. denied,* 460 U.S. 1041, 103 S.Ct. 1435, 75 L.Ed.2d 794 (1983); *Arango v. Guzman Travel Advisors Corp.,* 621 F.2d 1371, 1380 n. 11 (5th Cir.1980); *Industrial Inv. Dev. Corp. v. Mitsui & Co.,* 594 F.2d 48, 52 (5th Cir.1979), *cert. denied,* 445 U.S. 903, 100 S.Ct. 1078, 63 L.Ed.2d 318 (1980), thus far we have not actually adopted the commercial activity exception, *Airline Pilots Ass'n v. Taca Int'l Airlines,* 748 F.2d 965, 970 n. 2 (5th Cir.1984), *cert. denied,* — U.S. —, 105 S.Ct. 2324, 85 L.Ed.2d 842 (1985). In *Entex,* we held that the actions in question were governmental rather than commercial, and thus never had the opportunity to determine whether, if they were commercial, the act of state doctrine would apply. 686 F.2d at 326. Similarly, we held in *Mitsui* that the act of state doctrine did not apply for other reasons and thus did not reach the commercial activity exception issue. 594 F.2d at 52. Finally, in *Arango,* the commercial activities in question were not invested with the sovereign authority of the state; they consisted merely of the sale of airline tickets and tourist cards, and the activities in connection therewith. 621 F.2d at 1380 n. 11.

tract, not Mexico's promulgation of the exchange control regulations, adjudication of the breach of contract claim would necessarily call into question the Mexican regulations. Under these regulations, Bancomer has discharged its obligation to the Callejos by paying off the certificates in pesos at the established rate of exchange. Thus, we could require Bancomer to honor the terms of the certificates only by disregarding the regulations. *See Braka v. Bancomer, S.N.C.,* 762 F.2d 222, 225–26 (2d Cir.1985).

The power to issue exchange control regulations is paradigmatically sovereign in nature; it is not of a type that a private person can exercise. Unlike in *Dunhill,* where Cuba repudiated a single debt, here Mexico promulgated comprehensive, national decrees in response to a national monetary crisis. As the court noted in *Braka v. Bancomer, S.A.,* 589 F.Supp. 1465 (S.D.N.Y.1984), *aff'd,* 762 F.2d 222 (2d Cir.1985),

> Mexico's act in this instance cannot be construed as a simple repudiation of a government entity's commercial debt. While the ultimate result may seem similar—i.e. Mexico has enriched itself at plaintiff's expense—the mechanisms used by Mexico are conventional devices of civilized nations faced with severe monetary crises, rather than the crude and total confiscation by force of a private person's assets.

*Id.* at 1472. Were we to disregard the exchange regulations by enforcing the Callejos' certificates of deposit, we would render nugatory the attempts by Mexico to protect its foreign exchange reserves. While we are doubtful of our ability to foresee what will vex the peace of nations, we have no doubt that disregarding the Mexican regulations would be very vexing indeed. We therefore reject the Callejos' commercial activity argument. *Accord Braka v. Bancomer,* 589 F.Supp. at 1472; *cf. Garcia v. Chase Manhattan Bank,* 735

F.2d 645, 650 (2d Cir.1984) ("[I]f the situs of Chase's debt to Garcia were in Cuba, the Cuban government could validly seize it."); *French v. Banco Nacional de Cuba,* 23 N.Y.2d 46, 55, 295 N.Y.S.2d 433, 443, 242 N.E.2d 704 (1968) ("[T]he currency regulations of a foreign state ... are not appropriate subjects for evaluation by state courts applying local conceptions of public policy.").

## B. The Treaty Exception

The act of state doctrine is premised not only on an unwillingness to apply American public policy to invalidate foreign laws but also on a pessimism about the competence of the judiciary to ascertain norms of international law. Potentially, international law as well as American public policy could serve as a touchstone for evaluating foreign acts of state: if an act of state were contrary to international law we could treat the act as invalid and adjudicate the plaintiff's claim. This approach would allow us to review foreign acts of state without engaging in the dubious practice of evaluating these acts against the potentially parochial norms of American public policy.

The Court, however, in large part foreclosed this avenue of review in *Banco Nacional de Cuba v. Sabbatino,* 376 U.S. 398, 84 S.Ct. 923, 11 L.Ed.2d 804 (1964). There the Court was asked to review the validity of Cuba's expropriation of a Cuban sugar company owned by United States residents. The Court declined to do so, holding that this country's response to Cuba's acts should be fashioned and implemented by the executive, not the judiciary. *Id.* at 431–32, 84 S.Ct. at 942. Although the Court admitted that Cuba's acts might have violated international law, it held that international opinion was sufficiently divided that international law did not provide a firm basis for adjudicating the validity of Cuba's acts. *Id.* at 428–31, 84 S.Ct. at 940–42.[18] In essence, the Court held that

---

**18.** Although the Court stated in a footnote that "[t]here are, of course, areas of international law in which consensus as to standards is greater and which do not represent a battleground

for conflicting ideologies," and went on to state that "[t]his decision in no way intimates that the courts of this country are broadly foreclosed from considering questions of international

international law generally does not provide "judicially discoverable and manageable standards for resolving" cases. *See Baker v. Carr*, 369 U.S. 186, 217, 82 S.Ct. 691, 710, 7 L.Ed.2d 663 (1962); *see also First National City Bank v. Banco Nacional de Cuba*, 406 U.S. 759, 787–88, 92 S.Ct. 1808, 1823, 32 L.Ed.2d 466 (1972) (Brennan, J., concurring) (validity of foreign act of state is "political question" because of lack of consensus on applicable international rules); *Sharon v. Time, Inc.*, 599 F.Supp. 538, 547–48 (S.D.N.Y.1984) (comparing act of state and political question doctrines).

In *Sabbatino*, however, the Court recognized that "the greater the degree of codification or consensus concerning a particular area of international law, the more appropriate it is for the judiciary to render decisions regarding it, since the courts can then focus on the application of an agreed upon principle to circumstances of fact rather than on the sensitive task of establishing a principle not inconsistent with national interest or with international justice." *Sabbatino*, 376 U.S. at 428, 84 S.Ct.

at 940. On this basis, the Court elaborated an exception to the act of state doctrine under which the doctrine may not apply if there is "a treaty or other unambiguous agreement regarding controlling legal principles." *Id.*

Here, the Callejos claim that the Mexican exchange control regulations violate the Articles of Agreement of the International Monetary Fund ("Fund Agreement"), Dec. 27, 1945, 60 Stat. 1401, T.I.A.S. No. 1501, 2 U.N.T.S. 39, *as amended* April 30, 1976, 29 U.S.T. 2203, T.I.A.S. No. 8937, —— U.N.T.S. —— (amendments effective April 1, 1978), to which Mexico is a party. In particular, they claim that the regulations violate Article VIII, Section 2(a), which forbids members from imposing exchange control regulations on "current international transactions" [19] without the prior approval of the International Monetary Fund ("IMF" or "Fund").[20] The Callejos argue that because the Fund Agreement is "a treaty or other unambiguous agreement," the act of state doctrine does not apply.[21]

law," *id.* at 430 n. 34, 84 S.Ct. at 941 n. 34, to our knowledge this caveat has never been pursued. We are unaware of any cases since *Sabbatino* that have construed customary international law to invalidate a foreign act of state. *See* Restatement (Revised), *supra* note 13, at § 469 comment b.

**19.** The term, "current international transactions" is defined in Article XXX(d) of the Fund Agreement, which states in pertinent part:

(d) Payments for current transactions means payments which are not for the purpose of transferring capital, and includes, without limitation:

(1) all payments due in connection with foreign trade, other current business, including services, and normal short-term banking and credit facilities;

(2) payments due as interest on loans and as net income from other investments;

. . . .

The Fund may, after consultation with the members concerned, determine whether specific transactions are to be considered current transactions or capital transactions.

**20.** The Callejos also argue for the first time on appeal that the exchange regulations violate Art. VIII, § 3 of the Fund Agreement. Generally, we do not consider issues that were not raised before the district court unless our failure to do

so would result in grave injustice, *Masat v. United States*, 745 F.2d 985, 988 (5th Cir.1984), or unless the issue can be resolved as a matter of law or is otherwise beyond doubt, *Texas v. United States*, 730 F.2d 339, 358 n. 35 (5th Cir.), *cert. denied*, —— U.S. ——, 105 S.Ct. 267, 83 L.Ed.2d 203 (1984). Here, the Callejos' failure to raise the Art. VIII, § 3 issue has prejudiced Bancomer by precluding it from obtaining evidence from the IMF that the exchange regulations do not violate that provision. Therefore, we decline to consider this argument.

**21.** Apart from the Fund Agreement, the Mexican exchange control regulations appear to be permissible under international law. The Restatement (Second), *supra* note 12, approves such measures when "reasonably necessary ... to protect the foreign exchange resources of the state," and notes, "[T]he application to an alien of a requirement that foreign funds held within the territory of the state be surrendered against payment in local currency at the official rate of exchange is not wrongful under international law, even though the currency is less valuable on the free market than the foreign funds surrendered." *Id.* at § 198 & comment b; *see also* 8 M. Whiteman, *Digest of International Law* 981–82, 988–90 (1967). "This is not an era ... in which there is anything novel or internation-

In the twenty years that have elapsed since its inception in *Sabbatino,* the treaty exception to the act of state doctrine has been applied sparingly, *see, e.g., Kalamazoo Spice Extraction Co. v. Provisional Military Government of Socialist Ethiopia,* 729 F.2d 422 (6th Cir.1984); *American International Group, Inc. v. Islamic Republic of Iran,* 493 F.Supp. 522 (D.D.C. 1980), *modified on other grounds,* 657 F.2d 430 (D.C.Cir.1981); *cf. Ramirez de Arellano v. Weinberger,* 745 F.2d 1500, 1540–41 (D.C.Cir.1984) (en banc) (stating in dicta that treaty exception may apply), *vacated on other grounds,* —— U.S. ——, 105 S.Ct. 2353, 86 L.Ed.2d 255 (1985)—by this court not at all. Although *Sabbatino* refers merely to "treat[ies] or other unambiguous agreements," treaties are not all of a piece; they come in different sizes and shapes, ranging from the Convention for the Unification of Certain Rules Relating to International Transportation by Air ("Warsaw Convention"), Oct. 12, 1929, 49 Stat. 3000, T.S. No. 876, which sets forth unambiguous rules governing the air carriage of passengers, baggage, and cargo, to the United Nations Charter, June 26, 1945, 59 Stat. 1031, T.S. No. 993, whose broad but vague pronouncements are more similar to those of the United States Bill of Rights. For this reason, the treaty exception was not stated in *Sabbatino* as "an inflexible and all-encompassing rule," 376 U.S. at 428, 84 S.Ct. at 940; instead, its application depends on pragmatic considerations, in-

cluding both the clarity of the relevant principles of international law and the potential implications of a decision on our foreign policy. *Id.*[22]

In determining whether the Fund Agreement—and Article VIII, Section 2(a) in particular—warrant application of the treaty exception, we tread upon uncharted ground. Thus far, no court has passed on this issue, and commentators have made, at best, ambiguous pronouncements. *See, e.g.,* 2 J. Gold, *The Fund Agreement in the Courts* 138–39 (1982) ("The Articles of Agreement [of the IMF] *could* come within" the treaty exception.); Paradise, *Cuban Refugee Insureds and the Articles of Agreement of the International Monetary Fund,* 18 U.Fla.L.Rev. 29, 67 (1965). Initially, we note that it is unclear to what extent the Fund Agreement is unclear. Article VIII, Section 2(a) applies by its terms only to exchange control regulations governing "current international transactions" (as opposed to "capital transfers"). Under Article VI, Section 3 of the Fund Agreement, members may validly impose restrictions on international capital movements. Thus, determining whether a set of exchange control regulations requires approval by the Fund pursuant to Article VIII, Section 2(a) depends in part on determining whether they apply to "current" or "capital" transactions. Given the substantial uncertainty regarding the meanings of these terms,[23] we are doubtful that Article

ally reprehensible about even the most stringent regulation of national currencies and the flow of foreign exchange. Such practices have been followed, as the exigencies of international economics have required—and despite resulting losses to individuals—by capitalist countries and communist countries alike, by the United States and its allies as well as by those with whom our country has had profound differences. They are practices which are not even of recent origin but which have been recognized as a normal measure of government for hundreds of years, if not, indeed, as long as currency has been used as the medium of international exchange." *French v. Banco Nacional de Cuba,* 23 N.Y.2d 46, 63, 295 N.Y.S.2d 433, 242 N.E.2d 704 (1968); *accord Braka v. Bancomer, S.A.,* 589 F.Supp. 1465, 1473 (S.D.N.Y.1984), *aff'd,* 762 F.2d 222 (2d Cir.1985).

**22.** Significantly, the Court in *Sabbatino* articulated the treaty exception in negative rather than positive terms: It stated that "the Judicial Branch will not examine the validity of a [foreign act of state] ... in the absence of a treaty or other unambiguous agreement," *id.,* but did not state the converse, namely, that if a treaty exists then the act of state doctrine does not apply.

**23.** *Compare* H. Smit, N. Galston & S. Levitsky, *International Contracts* § 6.06(1)(b), at 165–66 ("current transactions" include international deposits) *with* Evans, *Current and Capital Transactions: How the Fund Defines Them,* 5 Fin. & Dev. 30, 34 (1968) ("current transactions" are those arising from international trading activities). *See generally* F. Mann, *The Legal Aspect of Money* 396 (4th ed. 1982) ("extremely diffi-

VIII, Section 2(a) is the type of "unambiguous agreement" referred to in *Sabbatino. See* Paradise, *supra,* at 67 ("Article VIII, section 2 of the Fund Agreement is the most complicated of the provisions of the Fund Agreement and clearly is not 'unambiguous.' ").[24]

■ In the context of the present case, however, we need not pass on this question in the abstract, since the IMF has itself clarified the meaning of the Fund Agreement as it applies to the Mexican regulations by indicating that they are consistent with the Agreement. On May 3, 1983, in response to an inquiry from Bancomer's counsel, the Director of the Legal Department of the Fund specifically stated that

"the 'provisions of Mexico's Currency Regulations (enacted in August and continuing in effect today) which require repayment of deposits in Mexican banks to be made in Mexican pesos regardless of the currency in which the deposits are denominated' ... do not violate and are not inconsistent with the Articles of Agreement of the International Monetary Fund." 2 Rec. at 428.[25] This determination at once renders the Fund Agreement unambiguous in its application to the present case, but also defeats, on the merits, the Callejos' Article VIII, Section 2(a) claim.

We consider the Fund's interpretations to be persuasive authority on the meaning of the Fund Agreement.[26] The Fund

cult" to determine meaning of " 'current transactions' which is only very inadequately defined" by the Fund Agreement); J. Gold, *The Cuban Insurance Cases and the Articles of the Fund* 37–45 (IMF Pamphlet Series no. 8, 1966) (discussing confusion surrounding terms "capital" and "current" transactions).

24. The Callejos contend that the Fund Agreement need not be unambiguous to fall within the scope of the treaty exception, since the term "unambiguous" in the phrase, "treaties and other unambiguous agreements," modifies only "other agreements" and not "treaties." This reading of the treaty exception, however, not only strains the syntax of the sentence; it is also directly contrary to the policy considerations underlying the act of state doctrine, namely, to forestall the courts from adjudicating cases when there are no agreed upon controlling legal principles.

25. Although the Callejos did not question the sufficiency of the Fund's May 3 letter before the district court, they argue on appeal that the letter is inadequate evidence of the Fund's position since, under Art. VIII, § 2(a) and Art. XXIX, only the Executive Board of the Fund can approve exchange regulations and offer interpretations of the Fund Agreement. In response, Bancomer attached as appendices to its brief copies of two letters, one from the Secretary of the IMF stating that the May 3 letter had been authorized by the Executive Board of the IMF, and the other from the Director of the Legal Department of the IMF stating that the Executive Board approved the Mexican exchange control regulations on December 23, 1982. Since these letters were not introduced into evidence in the court below, they cannot be considered by us on appeal. *United States v. One 1978 Piper Navajo PA–31 Aircraft,* 748 F.2d 316, 319 (5th Cir.1984); *Titus v. Mercedes Benz of North America,* 695 F.2d 746, 756 n. 3 (3rd

Cir.1982); Fed.R.App.P. 10(a). By the same token, however, we cannot consider arguments raised for the first time on appeal, especially where, as here, the failure to raise them before the district court has prejudiced the other side's ability to respond. *See supra* note 20.

Although the May 3 letter is not dispositive of the Fund's position, we believe that it is *prima facie* evidence. Because the Callejos failed to offer any evidence to rebut or otherwise undermine the letter, we believe that they failed to raise a genuine issue of fact regarding the Fund's approval of the Mexican regulations. This result is buttressed by the IMF's general interpretive view that currency regulations should be presumed to be in conformity with the Fund Agreement unless the Fund indicates otherwise. *See* 1 J. Horsefield, *The International Monetary Fund, 1945–1965,* at 210 (1969) (discussing the Legal Department's opinion letter of Oct. 29, 1948). Under this view, it is the plaintiff's burden to demonstrate that the IMF disapproved the currency regulations in question, rather than the defendant's burden to prove the converse. Here, the Callejos introduced no evidence that the Fund has disapproved the Mexican regulations.

26. According to some commentators, since Art. XXIX of the Fund Agreement makes interpretations by the Fund binding on signatory nations, they are subsidiarily binding on the courts of signatory nations, including those of the United States. *See* J. Gold, *Interpretation by the Fund* 31–42 (IMF Pamphlet Series No. 11, 1968) (discussing predecessor of Art. XXIX). We express no view on this question here, and employ the Fund's interpretation merely as persuasive rather than as binding authority. *See Braka v. Bancomer, S.A.,* 589 F.Supp. 1465, 1473 (S.D.N.Y. 1984) (citing letter from Director of Legal Department of IMF as authority that Mexican ex-

Agreement is a complex regulatory document whose sense is often obscure. In interpreting it, we defer to the greater expertise of the Fund. *See* J. Gold, *supra* note 26, at 43 (Information about whether regulations are imposed consistently with the Fund Agreement is "of a kind that [is] likely to be available only to the Fund. It is virtually impossible for anyone else to make the determination of consistency, and it certainly cannot be derived from a perusal of the Articles."). This deference is akin to the deference that we accord to an administrative agency's interpretations of its own statutory scheme. *See Chevron, U.S.A., Inc. v. Natural Resources Defense Council,* — U.S. ——, ——, 104 S.Ct. 2778, 2782–83, 81 L.Ed.2d 694 (1984); *NLRB v. Bell Aerospace Co. Division of Textron, Inc.,* 416 U.S. 267, 275, 94 S.Ct. 1757, 1762, 40 L.Ed.2d 134 (1974). Here, however, an additional policy counsels in favor of deference: promoting uniform interpretations of the Fund Agreement. In contrast to the domestic sphere, where the territorial reach of our jurisdiction is coextensive with that of the statutes that we interpret, here we cannot give interpretations of the Fund Agreement that are binding on other member nations. *See* Restatement (Second), *supra* note 12, at § 148(2). If each member of the Fund were to interpret the Fund Agreement separately—deciding when and when not to follow the Fund's own interpretations—this would detract from the Fund Agreement's underlying policy of promoting uniformity in international finance. We do not believe that the act of state doctrine—the principal purpose of which is to prevent the courts from becoming embroiled in sensitive international disputes—would be served by chal-

lenging acts whose validity has not otherwise been questioned. The treaty exception was intended to allow courts to apply international law where consensus exists; it was not intended to allow courts to upset a preexisting consensus regarding the validity of a foreign act of state.[27]

The exact basis for the Fund's conclusion that the Mexican regulations are consistent with the Fund Agreement is somewhat unclear. The Fund's conclusion could be based (1) on its view that the Mexican regulations govern capital rather than current transactions, in which case Article VIII, Section 2(a) approval was not required, and/or (2) on its granting approval of the regulations pursuant to Article VIII, Section 2(a). If the Fund's conclusion is based on the first ground, then, at most, we can only review the Fund's interpretation to determine whether it is reasonable, since we consider the Fund's interpretation to be highly persuasive authority. Here this standard is clearly met, particularly given the uncertainty that exists regarding the dividing line between current and capital transactions. If, however, the Fund's conclusion rests on the latter ground, then we are precluded from exercising even this limited level of review. Article VIII, Section 2(a) only requires that exchange control regulations receive the approval of the Fund; once such approval is given, the regulations are by definition valid. The decision whether to approve exchange control regulations is committed to the discretion of the Fund. We have no power to review the Fund's exercise of this discretion. Thus, even if we did not accept the Fund's interpretation of the Fund Agreement as persuasive authority, its decision to approve exchange control regulations

change control regulations do not violate Fund Agreement), *aff'd,* 762 F.2d 222 (2d Cir.1985); Restatement (Revised), *supra* note 13, at § 325 reporters' note 4.

**27.** Bancomer contends that if the Mexican exchange control regulations were promulgated in conformity with the Fund Agreement, we must dismiss this case under Art. VIII, § 2(b) of that Agreement, which forbids courts from enforcing "exchange contracts" involving the currency of a Fund member that violate the member's

currency regulations. *See* 22 U.S.C. § 286h (1982) (incorporating Art. VIII, § 2(b) into U.S. law). In essence, § 2(b) is an internationally imposed act of state doctrine. Since we already dismiss the case under our own domestic act of state doctrine, we need not consider this additional defense. *Cf. Libra Bank Ltd. v. Banco Nacional de Costa Rica,* 570 F.Supp. 870, 896 n. 1 (S.D.N.Y.1983) (discussing relation of Art. VIII, § 2(b) and act of state doctrine).

pursuant to Article VIII, Section 2(a) would be final.

The Callejos attempt to avoid this result by arguing that even if the Fund did approve the Mexican regulations, it failed to do so *prior* to their promulgation. *See* Reply Brief of Appellants at 15–16. While such prior approval is technically required by Article VIII, Section 2(a), we do not believe that the violation of this requirement is of a magnitude sufficient to justify disregarding the act of state doctrine, particularly where approval is later given by the Fund.[28] The treaty exception to the act of state doctrine does not penalize a foreign country for every failure to "go by the book." The same prudential considerations that underlie the act of state doctrine apply to the treaty exception as well.

For these reasons, we hold that the treaty exception does not render the act of state doctrine inapplicable to the Callejos' claims.

### C.  The Situs of the Deposits

The final argument advanced by the Callejos for not applying the act of state doctrine is that the situs of their CDs was Texas rather than Mexico. The Callejos argue that under traditional choice-of-law rules pegging the choice of law to the situs of the property, Texas law should govern the certificates. Application of the act of state doctrine, they contend, would improperly give extraterritorial effect to the Mexican decrees.

In *Sabbatino*, the Court limited the act of state doctrine to takings of property "within its own territory by a foreign sovereign government." 376 U.S. at 428, 84 S.Ct. at 940. Consistent with this limitation, we have refused to give effect to foreign acts of state that affected property whose situs was the United States. *See Maltina Corp. v. Cawy Bottling Co.*, 462 F.2d 1021 (5th Cir.), *cert. denied*, 409 U.S. 1060, 93 S.Ct. 555, 34 L.Ed.2d 512 (1972); *Tabacalera Severiano Jorge, S.A. v. Standard Cigar Co.*, 392 F.2d 706 (5th Cir.), *cert. denied*, 393 U.S. 924, 89 S.Ct. 255, 21 L.Ed.2d 260 (1968).[29]

The theory underlying the territorial limitation to the act of state doctrine is that a foreign state is less concerned about the effects of its acts on property outside of its

---

**28.** The Fund itself, in recognition of the fact that it is not always possible to obtain prior approval when exchange controls are imposed to preserve national security, has adopted more flexible procedures under which members must merely give notice to the Fund of the imposition of exchange controls. Unless the Fund specifically disapproves the controls, members are entitled to assume that the Fund approves the controls. *See* 3 *International Monetary Fund 1945–1965: Documents* 257 (J. Horsefield ed. 1969).

**29.** Even when an act of a foreign state affects property outside of its territory, however, we may still give effect to the act if doing so is consistent with United States public policy. *Maltina*, 462 F.2d at 1026–27; *accord Banco Nacional de Cuba v. Chemical Bank New York Trust Co.*, 658 F.2d 903, 908–09 (2d Cir.1981); *United Bank Ltd. v. Cosmic Int'l, Inc.*, 542 F.2d 868, 872–73 & n. 7 (2d Cir.1976); *Republic of Iraq v. First Nat'l City Bank*, 353 F.2d 47, 51 (2d Cir.1965), *cert. denied*, 382 U.S. 1027, 86 S.Ct. 648, 15 L.Ed.2d 540 (1966); *see also Libra Bank Ltd. v. Banco Nacional de Costa Rica*, 570 F.Supp. 870, 877, 882 (S.D.N.Y.1983); Restatement (Second), *supra* note 12, at § 43(2) ("A

court in the United States will give effect to an act of a foreign state [with respect to a thing located, or an interest localized, outside of its territory] ... only if to do so would be consistent with the policy and law of the United States."); *cf. United States v. Belmont*, 301 U.S. 324, 332, 57 S.Ct. 758, 761, 81 L.Ed. 1134 (1937) (applying Russian governmental decree to bank deposits in New York on ground that this furthered United States policy). Although the fact that the property is located outside of the foreign state reduces the potential for offense, the considerations underlying the act of state doctrine may still be present. *See Maltina*, 462 F.2d at 1029 (differences are only of degree). A foreign state's interest in the enforcement of its laws does not always end at its borders. In the present case, however, since we find that the situs of the certificates was Mexico and not the United States, we do not reach the second prong of the territorial limitation test, namely, whether recognizing the Mexican decrees would be consistent with the policy and law of the United States. *Cf. Allied Bank Int'l v. Banco Credito Agricola*, 757 F.2d 516, 519–20 (2d Cir.1985) (on rehearing) (holding that Costa Rican regulations suspending the repayment of external debt were contrary to American public policy).

territory than within. As we explained in *Maltina*,

> The obvious inability of a foreign state to complete an expropriation beyond its borders reduces the foreign state's expectations of dominion over that property.... Consequently, the potential for offense to the foreign state is reduced, there is less danger that judicial disposition of the property will 'vex the peace of nations,' and there is less need for judicial deference to the foreign affairs competence of the other branches of government.

462 F.2d at 1028–29.

In determining whether the situs of property is the United States or a foreign state, federal rather than state law governs. *Tabacalera*, 392 F.2d at 715; *cf. Sabbatino*, 376 U.S. at 425, 84 S.Ct. at 939 (issues regarding application of act of state doctrine must be treated as aspects of federal law). This is true even if the plaintiff's underlying claim is based on state law. As Judge Friendly noted in *Republic of Iraq v. First National City Bank*, 353 F.2d 47 (2d Cir.1965), *cert. denied*, 382 U.S. 1027, 86 S.Ct. 648, 15 L.Ed.2d 540 (1966):

> It is fundamental to our constitutional scheme that in dealing with other nations the country must speak with a united voice.... It would be baffling if a foreign act of state intended to affect property in the United States were ignored on one side of the Hudson but respected on the other; any such diversity between states would needlessly complicate the handling of the foreign relations of the United States. The required uniformity can be secured only by recognizing the expansive reach of the principle, announced by Mr. Justice Harlan in *Sabbatino*, that all questions relating to an act of state are questions of federal law, to be determined ultimately, if need be, by the Supreme Court of the United States.

353 F.2d at 50–51 (citations omitted).

On a previous occasion, we noted that "[t]he situs of intangible property is about as intangible a concept as is known to the law." *Tabacalera*, 392 F.2d at 714. "The situs may be in one place for ad valorem tax purposes, ...; it may be in another place for venue purposes, i.e., garnishment ...; it may be in more than one place for tax purposes in certain circumstances ...; it may be in still a different place when the need for establishing its true situs is to determine whether an overriding national concern, like the application of the Act of State Doctrine is involved." *Id.* at 714–15 (citations omitted). In determining the situs of an obligation, we take as our guide the general policies of the act of state doctrine rather than narrow rules developed in other contexts. *See Maltina*, 462 F.2d at 1027 ("[T]he federal courts are to take a pragmatic view of what constitutes an extraterritorial action by a foreign state.").

Over the years, several tests have been developed to determine the situs of intangible property. One was elaborated by this court in *Tabacalera*, where we stated,

> [W]e think it clear that whatever efforts were made by the Cuban government dealing with Tabacalera, these acts are to be recognized under the Act of State Doctrine only insofar as they were able to come to complete fruition within the dominion of the Cuban government. As to other matters we conclude that they were not a 'taking of property *within its own territory*' within the language used by the Supreme Court in *Sabbatino*.

392 F.2d at 715–16 (emphasis in original). Under this test, the situs of an obligation is determined not by the domicile of the creditor, as it is in other contexts, but by whether the foreign state is in a position to perform a *fait accompli. Id.* The policy considerations underlying this conclusion were elaborated by the court as follows: "[W]hen a foreign government performs an act of state which is an accomplished fact, that is when it has the parties and the *res* before it and acts in such a manner as to change the relationship between the parties touching the *res*, it would be an affront to such foreign government for courts of the United States to hold that such act was a

nullity." *Id.* at 715. Because the property in question in *Tabacalera* consisted of a credit that was owed by an American company in Florida and that Cuba therefore was not in a position to seize, the court held that the property was located in the United States and declined to apply the act of state doctrine.[30]

Although the *Tabacalera* test has been applied in a number of cases, *e.g., Allied Bank International v. Banco Credito Agricola,* 757 F.2d 516, 521 (2d Cir.1985) (on rehearing) (holding that debt is not located in foreign state unless foreign state has power to enforce or collect it); *United Bank Ltd. v. Cosmic International, Inc.,* 542 F.2d 868, 873–74 (2d Cir.1976) (same); *Menendez v. Saks & Co.,* 485 F.2d 1355, 1364 (2d Cir.1973) (same), *rev'd on other grounds sub nom., Alfred Dunhill of London, Inc. v. Republic of Cuba,* 425 U.S. 682, 96 S.Ct. 1854, 48 L.Ed.2d 301 (1976), we do not find it helpful here. In *Tabacalera,* the foreign government was attempting to collect a debt rather than attempting to avoid paying it; the question was whether the foreign decrees applied to an obligation owed by an American debtor. Here, in contrast, the situation is reversed: the foreign national is the debtor and the American national the creditor. If we simply applied the *Tabacalera* test, the situs of the certificates would clearly be Mexico, since Mexico can enforce the collection of debts owed by Bancomer, a Mexican domiciliary. *See Libra Bank Ltd. v. Banco Nacional de Costa Rica,* 570 F.Supp. 870, 881 (S.D.N.Y.1983). In that event, the act of state doctrine would apply whenever a foreign state seized debts owed by its banks, no matter how many ties the debts had to this country.

We do not think that *Tabacalera* intended such results. The power to collect a debt is for the benefit of the creditor, not the debtor; the fact that a debt can be enforced by the creditor in one forum should not be the basis of depriving him of his ability to enforce the debt in a different forum. Otherwise, the sword of the creditor would become a shield for the debtor. Since we do not believe that debts owed by foreign banks to American nationals are always sitused in the foreign country—and consequently do not believe that the act of state doctrine always applies to such debts—we do not apply the *Tabacalera* test here. *See Libra Bank,* 570 F.Supp. at 881. *But cf. Garcia v. Chase Manhattan Bank,* 735 F.2d 645, 651–52 (2d Cir.1984) (Kearse, J., dissenting) (arguing that situs of certificate of deposit owed by Cuban branch bank was Cuba, since debt could be collected there); *Vishipco Line v. Chase Manhattan Bank,* 660 F.2d 854, 862 (2d Cir.1981) (" 'The situs of a bank's debt on a deposit is considered to be where the deposit is carried.' "), *cert. denied,* 459 U.S. 976, 103 S.Ct. 313, 74 L.Ed.2d 291 (1982).

Instead, for debts owed by foreign banks to American nationals, the proper test for determining situs is where the incidents of the debt, as a whole, place it. One relevant factor is the place where the deposit is carried, but this is not the only factor. In addition, we must examine the place of payment, the intent of the parties (if any) regarding the applicable law, and the involvement of the American banking system in the transaction.[31] Together,

---

**30.** It is unclear what result would have been reached in *Tabacalera* if the American debtor had had assets in Cuba, since then Cuba would have been in a position to perform a *fait accompli* by seizing these assets. Arguably, the situs of the debt might still have been the United States on the ground that the assets in Cuba were not the same assets as those owed by the American company. However, this would depend on an independent test for locating the situs of the obligation; it would be circular to argue that Cuba could not collect the debt because the debt was not located in Cuba, if the location of the debt was itself defined in terms of where it could be collected.

**31.** These factors have been used on a number of occasions to determine the situs of debts owed by foreign banks. In *Garcia,* for example, the court located in the United States a certificate of deposit issued by Chase Manhattan's Cuban branch, on the ground that the certificate was guaranteed by Chase's New York office and could be repaid by presentation at any Chase branch. 735 F.2d at 650. Similarly, in *Libra Bank,* the court determined that the situs of a

these factors help us to determine the extent of the foreign government's interest in the debt. They therefore help to answer the ultimate question in the act of state context: Are the ties of the debt to the foreign country sufficiently close that we will antagonize the foreign government by not recognizing its acts? *Cf. Allied Bank,* 757 F.2d at 521–22 (comparing American and Costa Rican interests in overseeing the debts in question).

■■■■ Here, the incidents of the certificates of deposit clearly place them in Mexico. The certificates of deposit were issued by Bancomer's Nuevo Laredo branch, where the Callejos' deposits were carried, and called for payment in Mexico. This grouping of contacts, when viewed through the gloss of the policies underlying the act of state doctrine, places the debt in Mexico and calls for the application of Mexican law.[32]

■■■ The Callejos contend, however, that although the specified place of payment was Mexico, the course of conduct of the parties altered this agreement since the Callejos regularly received their payments in Texas. The Callejos, however, mistake remittances for payments. Although Bancomer remitted its payments to the Callejos in Texas, this did not mean that the place of payment was Texas. Unlike in *Garcia,* where the certificates of deposit issued by the Cuban branch bank were guaranteed

by Chase Manhattan's New York office and payable upon presentation at any Chase Manhattan branch worldwide, 735 F.2d at 646, here the Callejos could not receive payment simply by presenting the certificates at one of Bancomer's correspondent banks in Texas. They had no right to draw directly upon Bancomer's accounts with Texas banks. Although the money was transferred to them through the services of a Texas correspondent bank, and although they were in Texas when they actually received the payments, this does not alter the fact that the only place where they had a legal right to be paid was at Bancomer's office in Mexico. *Accord Braka v. Bancomer, S.N.C.,* 762 F.2d 222, 224 (2d Cir.1985) ("[T]he accomplishment of interbank transfers, which was the extent of the New York agency's participation, does not change the contractually mandated situs of plaintiffs' property."); *cf. United States v. First National City Bank,* 321 F.2d 14, 19–22 (2d Cir.1963) (no legal right against main office of bank to demand payment for deposit in branch bank abroad), *aff'd on rehearing en banc,* 325 F.2d 1020 (2d Cir.1964), *rev'd on other grounds,* 379 U.S. 378, 85 S.Ct. 528, 13 L.Ed.2d 365 (1965).

■■■ The Callejos make much of the fact that when they made deposits, the money was in the first instance transferred to Bancomer's account at Laredo National

loan to a Costa Rican bank was the United States, since the loan agreement provided that New York law would govern, the Costa Rican bank consented to the jurisdiction of American courts, the place of payment was Chase Manhattan's New York branch, and the Costa Rican bank had substantial assets in the United States. 570 F.Supp. at 881–82. As the court noted, "The Costa Rican decrees attempted to alter the legal relations between the parties with respect to the debt by extinguishing the legal right to repayment, the only property in question, whose situs was in New York." *Id.* at 882; *see also Allied Bank,* 757 F.2d at 521 (situs of promissory notes issued by Costa Rican banks to syndicate of 39 creditor banks was New York, where notes payable, negotiations held, and syndicate agent located); *Weston Banking Corp. v. Turkiye Garanti Bankasi,* 57 N.Y.2d 315, 456 N.Y.S.2d 684, 442 N.E.2d 1195 (1982) (situs of promissory note issued by Turkish bank to Panamanian bank

was United States, since note designated New York as proper jurisdiction for the resolution of disputes and as place of payment); Restatement (Revised), *supra* note 13, at § 469 reporters' note 4; *cf. Dunn v. Bank of Nova Scotia,* 374 F.2d 876, 877–78 (5th Cir.1967) (situs of deposit at place of deposit, unless alternative place of payment designated).

**32.** The Callejos claim that the deposits were nevertheless sitused in Texas on the ground that this was the intent of the parties. This evidence, however, is inadmissible, given that the certificates of deposit were integrated contracts and are subject to the parol evidence rule. Where certificates of deposit clearly specify a place of payment, parol evidence that a different place of payment was intended should be disregarded in the absence of fraud, duress, or mutual mistake. *See* 32A C.J.S. *Evidence* § 895 at 254 (1964).

Bank in Laredo, Texas. They contend, on this basis, that the deposits were made in Texas, where Bancomer first received control over the money, not in Mexico. We take a less formalistic approach to the problem of determining where a deposit is made. Here, the evidence was undisputed that, after receiving the money in its account at Laredo National Bank, Bancomer promptly transferred the money to its Nuevo Laredo branch; at the end of each business day its balance with Laredo National remained unchanged. Under these circumstances, Laredo National acted merely as a conduit for the deposits, not as their repository. *Cf. Braka v. Bancomer*, 762 F.2d at 224–225 (holding that situs of deposits was Mexico, even though deposits initially received by Mexican bank's New York agency). To hold otherwise would throw a monkeywrench into the wheels of international finance, whose smooth operation depends in large part on the lubricating influence of correspondent banks. It would mean that the deposits held by a bank would have different situses depending on the locations of the correspondent banks that first received them. Potentially a bank would have to comply with different laws for different deposits at a single branch. Rather than open this Pandora's box, banks would almost certainly attempt to receive deposits directly, without the services of a correspondent bank.

For these reasons, therefore, we reject the view that the situs of these deposits was Texas rather than Mexico. Indeed, we note that under Texas law, Bancomer, as a foreign bank, did not even have the power to receive deposits in Texas. Texas Const. art. 16, § 16; Tex.Rev.Civ. Stat.Ann. art. 342–902 to –903 (Vernon 1973 & Supp.1985). Moreover, holding that Mexico rather than Texas was the situs of the deposits furthers the general policies of the act of state doctrine. Given Mexico's interest in these certificates of deposit, which were issued by a Mexican bank and payable in Mexico, disregarding Mexico's exchange regulations would be a serious affront. We decline to take this course. Instead, we apply the act of state doctrine and affirm the dismissal of the suit.[33]

## IV. CONCLUSION

Both the sovereign immunity and act of state doctrines are rooted in principles of international comity; both involve a balancing of our interest in providing a forum to injured parties against our interest in maintaining amicable relations with other nations by respecting their sovereign acts. However, the balance struck in regard to each doctrine may be different.

Here we hold that the act of state doctrine applies but that the doctrine of sovereign immunity does not; we hold both that

**33.** In their revised complaint, the Callejos alleged violations of § 12(1) of the Securities Act of 1933, 15 U.S.C. § 77*l*(1) (1982), and § 33A.(1) of the Texas Securities Act, Tex.Rev.Civ.Stat. Ann. art. 581–33A.(1), as well as breach of contract. We agree with the Callejos that these securities claims are not barred by the act of state doctrine, since they are based on Bancomer's initial failure to register the certificates of deposit, not on Bancomer's later breach of the certificates by complying with Mexico's exchange control regulations. Adjudicating these claims would not involve reviewing the validity of the exchange control regulations. *Cf. Arango v. Guzman Travel Advisors Corp.*, 621 F.2d 1371, 1380–81 (5th Cir.1980) (holding that act of state doctrine only barred plaintiffs' battery and false imprisonment claims, not plaintiffs' contract and negligence claims since these did not necessitate an evaluation of the legitimacy of the Dominican Republic's acts of state). We dismiss these claims, however, on the ground that the certificates of deposit sold by Bancomer were not "securities" within the meaning of the federal and Texas securities laws. We agree with the recent opinion of the Ninth Circuit in *Wolf v. Banco Nacional de Mexico*, 739 F.2d 1458 (9th Cir.1984), *cert. denied*, — U.S. —, 105 S.Ct. 784, 83 L.Ed.2d 778 (1985), that purchasers of certificates of deposit issued by Mexican banks are adequately protected by Mexican banking law and consequently do not require the protections afforded by federal securities laws. *Id.* at 1463. This conclusion also applies to the Callejos' claims under the Texas Securities Act, since the decisions of federal courts construing the meaning of "securities" under the federal act are considered by Texas courts to be a "reliable guide" to the definition of "securities" under the Texas Act. *First Municipal Leasing Corp. v. Blankenship, Potts, Aikman, Hagin & Stewart*, 648 S.W.2d 410, 414 (Tex.App.—Fort Worth 1983, writ ref'd n.r.e.).

the case is based on commercial acts that directly affected the United States, and that it implicates sovereign acts taken by Mexico to preserve its foreign exchange reserves. At first glance, these holdings may seem inconsistent. But they reflect an underlying unity. They reflect the fact that the deposits in question have ties with both the United States and Mexico and that therefore both countries have an interest in the deposits. The interest of the United States justifies our exercise of jurisdiction under the FSIA to hear claims that the terms of the deposits have been breached; the interest of Mexico justifies the application of its exchange control decrees to the deposits.

We express no opinion as to which of these interests is greater. The act of state doctrine reserves that question for the political branches. It reflects the view that where competing sovereign interests are at stake, the delicate task of resolving disputes is best handled through diplomatic channels.

The judgment of the district court dismissing the present case is AFFIRMED.