Jack WEST, Leroy Swanson, and Margarety Swanson, for themselves and on behalf of all other similarly situated, Plaintiffs-Appellants,

v.

MULTIBANCO COMERMEX, S.A., a corp., Defendant-Appellee.

Philip B. THOMPSON, Anrienne S. Thompson, Donald S. Logan, Etta A. Logan, for themselves and on behalf of all others similarly situated, Plaintiffs-Appellants,

v.

BANCOMER, S.N.C., a corp., Defendant-Appellee.

George M. DAVIES, June H. Davies, Anthony J. Greco, Evelyn A. Greco, for themselves and on behalf of all others similarly situated, Plaintiffs-Appellants,

v.

BANCO NACIONAL DE MEXICO, S.A. aka Banamex, a corp., Defendant-Appellee.

Nos. 85-2162 to 85-2164.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Feb. 14, 1986.

Decided Jan. 6, 1987.

meaningful access to the courts, does not affect our decision here.

R.J. Wolf, San Rafael, Cal., for plaintiffs-appellants.

Robert Ehrenbard, Kelley, Drye & Warren, Manuel R. Angulo, Curtis, Mallet-Prevost, Colt & Mosle, New York City, David W. Steuber, Paul, Hastings, Janofsky & Walker, Los Angeles, Cal., for defendant-appellee.

Before GOODWIN, HUG, and REINHARDT, Circuit Judges.

REINHARDT, Circuit Judge:

In these consolidated cases, plaintiffs, individual U.S. investors who purchased peso- and dollar-denominated certificates of deposit from defendant banks, appeal the district court's grant of a motion for summary judgment. We affirm.

Jack West and his fellow investors responded to solicitations inviting U.S. citizens and residents to purchase peso- and dollar-denominated certificates of deposit issued by the Mexican banks. Beginning in 1979, for example, defendant Banamex mailed a brochure entitled *Mexico's Other Great Climate ... Investment* to numerous persons in the United States, encouraging investment in these accounts. The Mexican banks offered high rates of return, especially in the peso accounts, for term certificates of deposit. At the time of the solicitations and initial investments, the banks were privately owned.

In the late 1970's, in order to support its domestic spending programs, Mexico began to borrow extensively from both public and private foreign organizations. This borrowing was predicated upon the assumption that Mexico's oil reserves would generate sufficient revenues to meet its debt service. These oil revenues were Mexico's primary source of foreign currency. In August 1982, as the price of world oil fell significantly, the Government of Mexico experienced a serious deficiency in the foreign currency reserves it needed to repay its debts. Accordingly, it instituted a program of exchange control regulations designed to provide it with greater ability to monitor and maintain the exchange value of the peso.

The Government of Mexico issued a number of decrees beginning in mid-August 1982 that affected certificates of deposit in Mexican banks, including those certificates held by the U.S. plaintiffs. On August 12, 1982, exchange control regulations were promulgated, preventing holders of certificates of deposit from receiving payment in currency other than the peso. These regulations provided that the conversion of foreign exchange accounts was to be at the rate of exchange prevailing at the time and place when payment of the certificates was due. Moreover, the decrees prohibited use of foreign currency as legal tender and banned the transfer of dollars abroad.

On September 1, 1982, President Lopez Portillo signed two additional decrees in an attempt to respond to the financial crisis facing his nation. First, the Government nationalized the entire private banking system. Second, the government issued more comprehensive exchange controls including a provision eliminating all bank deposits in foreign currency and specifying that repayment of those deposits were to be made in pesos at a rate of exchange to be determined by Banco de Mexico, Mexico's central bank.

When the dollar certificates of deposit matured following nationalization and the adoption of exchange controls, Multibanco Comermex converted those accounts at the specified rate of 70 pesos to the dollar. Other banks implemented the conversion policy in a similar manner. According to the plaintiffs, one account was converted into approximately 6½ million pesos which, when reconverted back into dollars in the United States at the then prevailing rate of 112 to 1, resulted in a net loss of principal of approximately one-third or $32,800.

The peso accounts remained in domestic currency. However, because there was an abrupt and unanticipated decline in value on the world market, plaintiffs with peso accounts suffered substantial losses. Those losses were realized when the peso accounts were converted to dollars in the United States. Each of the plaintiffs in these consolidated cases suffered losses of one type or the other—or both.

Plaintiffs filed these actions in federal district court alleging (1) violations of the federal securities laws, 15 U.S.C. § 77a et seq, for the sale and issuance of unregistered securities through interstate commerce and (2) a taking of property (the dollar-denominated certificates of deposit) by a foreign state in violation of international law. Defendants moved to dismiss the actions pursuant to Fed.R.Civ.P. 12(b)(6) for failure to state a claim. Because the motion was accompanied by affidavits and other supporting documents, the district court properly considered the motion as one for summary judgment.

The district court held that plaintiffs' securities law claims were controlled by this court's decision in *Wolf v. Banco Nacional de Mexico, S.A., (Banamex)*, 739 F.2d 1458 (9th Cir.1984), *cert. denied*, 469 U.S. 1108, 105 S.Ct. 784, 83 L.Ed.2d 778 (1985), which held that certificates of deposit issued by Mexican banks were not "securities." The district court also ruled that the takings claim was barred under the act of state doctrine. Accordingly, it granted defendant banks' motions. West and his fellow U.S. investors appeal. We affirm, although for somewhat different reasons.

## I. Jurisdiction

All three defendants in these consolidated cases are currently instrumentalities of the government of Mexico and hence may be entitled to assert sovereign immunity. Multibanco Comermex S.A., Bancomer S.N.C., and Banco Nacional de Mexico S.A. (Banamex) were nationalized by the government of Mexico on September 1, 1982. The federal courts have original jurisdiction over foreign states under 28 U.S.C. § 1330 (1982), unless the state is entitled to immunity under 28 U.S.C. §§ 1602–1611 (1982), the Foreign Sovereign Immunities Act (FSIA).

FSIA governs the determination of sovereign immunity of foreign entities. Claims of sovereign immunity present the theoretical conflict between "the municipal rights of the citizens whose protection defines sovereign authority and the international rights of the foreign sovereign whose reciprocal respect defines [domestic] sovereignty as well."[1] The Supreme Court has recently said that "foreign sovereign immunity is a matter of grace and comity on the part of the United States." *Verlinden B.V. v. Central Bank of Nigeria*, 461 U.S. 480, 486, 103 S.Ct. 1962, 1967, 76 L.Ed.2d 81 (1983).

■ There are two basic theories of sovereign immunity, absolute and restrictive.

1. David Kennedy, *International Legal Structures* III–280 (tent. ed. 1984).

The latter approach has gained the favor of most nations internationally and has been the policy of the United States since 1952. "Absolute" immunity means that if there is formal involvement in the activity in question by a foreign sovereign, such involvement renders that activity immune from scrutiny by domestic courts. The original and most important formulation of the absolute theory was by Chief Justice John Marshall in *The Schooner Exchange v. McFaddon*, 11 U.S. (7 Cranch) 116, 3 L.Ed. 287 (1812). Marshall's opinion emphasized sovereign equality, and ruled that foreign nations were in their essence immune from the exercise of jurisdiction by our courts.

> This perfect equality and absolute independence of sovereigns, and this common interest impelling them to mutual intercourse, and an interchange of good offices with each other, have given rise to a class of cases in which every [domestic] sovereign is understood to waive the exercise of a part of that complete exclusive territorial jurisdiction, which has been stated to be the attribute of every nation.

*Id.* 11 U.S. at 136 (footnote omitted). Marshall's twin concepts of absolute territorial sovereignty and absolute immunity of foreign sovereigns based upon the implied consent of the United States prevailed for a century and a half.

In 1952, the Department of State changed its position on the granting of sovereign immunity to foreign governments. The new policy was announced in a letter from the Department's Acting Legal Advisor Jack B. Tate to the Acting Attorney General, Philip Perlman, dated May 19, 1952 (the "Tate letter"). This letter announced the adoption of the so-called "restrictive theory" of sovereign immunity. As opposed to the absolute theory in which tangential involvement of a foreign sovereign was sufficient to prevent U.S. courts from exercising jurisdiction, in "the newer or restrictive theory ... the immunity of the sovereign is recognized with regard to sovereign or public acts (*jure imperii*) of a state, but not with respect to private acts (*jure gestionis*)." Tate, *Changed Policy Concerning the Granting of Sovereign Immunity to Foreign Governments*, 26 Dep't St.Bull. 984 (1952).

Until the enactment of FSIA in 1976, the Department of State made case-by-case decisions as to whether immunity was appropriate. Congress replaced this method of determining sovereign immunity by "codif[ying], as a matter of federal law, the restrictive theory." *Verlinden*, 461 U.S. at 488, 103 S.Ct. at 1968. FSIA empowers courts to determine the appropriateness of immunity as a legal question. *See* 28 U.S.C. § 1602; H.R.Rep. No. 1487, 94th Cong., 2nd Sess. 7 (1976), *reprinted in* 1976 United States Code Cong. & Admin. News, 6604, 6605.

Under the restrictive theory, actions not in a sovereign capacity are subject to the jurisdiction of U.S. courts (assuming the existence of the other requisite elements of jurisdiction). Nonetheless, the presumption under FSIA is that actions taken by foreign states or their instrumentalities are sovereign acts and thus protected from the exercise of our jurisdiction, unless one of the enumerated exceptions to FSIA applies. 28 U.S.C. § 1605(a)(1–5) & (b). When an exception to immunity is found, the state or instrumentality is liable to the same extent as a private person, except that punitive damages are not available against the state. 28 U.S.C. § 1606. Plaintiffs contend that two exceptions are applicable here: first that the banks' activities are "commercial" and, second, that the institution of exchange controls resulting in the elimination of dollar accounts constitutes a "[taking of property]" in violation of international law." *See* 28 U.S.C. § 1605(a)(2) & (a)(3).

■ Commercial activities of foreign states or their instrumentalities are not "sovereign acts" within the meaning of the restrictive theory of sovereign immunity and are the subject of a specific exception in FSIA. *See* 28 U.S.C. § 1605(a)(2). The House Report to FSIA notes that the "commercial activity" exception applies to "a commercial transaction or act having a

'substantial contact' with the United States." H.R.Rep. No. 1487 at 17, *reprinted in* 1976 United States Code Cong. & Admin.News at 6615. In *Wolf v. Banco Nacional de Mexico, S.A. (Banamex),* 739 F.2d 1458 (9th Cir.1984), *cert. denied* 469 U.S. 1108, 105 S.Ct. 784, 83 L.Ed.2d 778 (1985), we held that "the sale of the certificate of deposit by Banamex to Wolf was clearly 'a commercial activity carried on in the United States' by Banamex, within the meaning of § 1605(a)(2)." *Id.* at 1460. *Wolf* involved substantially identical issues to the present appeal and many of the same parties.[2] Here, as in *Wolf,* the banks solicited, marketed, and generally encouraged U.S. investors to deposit monies in their banks and promised investors extraordinary rates of return.

The defendants assert, however, that the Mexican banks "performed a critical role in the implementation of the currency control program applicable throughout Mexico [and thus] ... it cannot be said that this action is *based on* commercial activity." Although arguably foreclosed by *Wolf,* we will dispose of this issue on the merits since the same result obtains. It is correct, as the defendants suggest, that the "issue under the FSIA is to determine whether the act of the named defendant was performed in a sovereign or a commercial capacity." *Braka v. Bancomer, S.A.,* 589 F.Supp. 1465, 1469 (S.D.N.Y.1984) (Sofaer, J.), *aff'd* 762 F.2d 222 (2d Cir.1985). However, a finding of sovereign immunity is warranted only where the "activity in question is [not] one which private parties ordinarily perform [but is] peculiarly within the realm of governments." *Jurisdiction of U.S. Courts in Suits Against Foreign States: Hearings on H.R. 11315 Before Subcomm. on Administrative Law and Governmental Relations of the House Comm. on the Judiciary,* 94th Cong., 2d Sess. 53 (1976) (statement of Monroe Leigh, Legal Advisor, U.S. Dep't of State). Sovereign immunity is determined not only by the character of the actor, but also by the nature of the act.

We agree with the analysis of the Fifth Circuit in *Callejo v. Bancomer, S.A.,* 764 F.2d 1101 (5th Cir.1985). There plaintiffs also sought to challenge the actions of Bancomer. Bancomer claimed sovereign immunity, relying as it does here, on its compliance with Mexico's exchange control regulations. After noting that Bancomer was a government instrumentality, the *Callejo* court stated, "[this] action arose as a result of Bancomer's commercial banking activities ... [which] had a direct effect in the United States." *Callejo,* 764 F.2d at 1107. Here, as in *Callejo,* the defendants engaged in a regular course of commercial conduct in the United States and it was certainly foreseeable at the time of the solicitations that their commercial activities would subject them to suit. Moreover, that defendants were "prevented from complying with [their] contract[s] by a governmental decree flatly prohibiting the use of dollars as legal tender does not make [them] immune from suit as an agent of the Republic of Mexico" acting in a sovereign capacity. *Braka,* 589 F.Supp. at 1470. *See also Callejo,* 764 F.2d at 1110 ("In the present case, Bancomer did not act as an agent of the Mexican Government in implementing the exchange regulations; instead, it acted as any private party would in complying with the law."); *De Sanchez v. Banco Central de Nicaragua,* 770 F.2d 1385, 1391 (5th Cir.1985) ("[A]lthough the promulgation of the exchange regulations ... was a sovereign act, ... the relevant acts of the defendant [in *Callejo* ] consisted merely of selling and later breaching the certificates."). *Cf. Town of Hallie v. City of Eau Claire,* 471 U.S. 34, 105 S.Ct. 1713, 85 L.Ed.2d 24 (1985); *California Retail Liquor Dealers Ass'n v. Midcal Aluminum, Inc.,* 445 U.S. 97, 100 S.Ct. 937, 63 L.Ed.2d 233 (1980) (standards for state action antitrust immunity for public and private actors).

---

**2.** In light of our disposition, we do not find it necessary to reach the res judicata issues potentially involved here.

West's securities claim is based upon the alleged material breach of his contract with the banks; the fact that the defendants were implementing exchange controls goes to whether that breach should be excused and not to whether this Court has jurisdiction. Thus, the defendants are not entitled to immunity from suit on the securities claim.

■ West asserts that we have jurisdiction over the expropriation claim pursuant to 28 U.S.C. § 1605(a)(3), the takings exception. A foreign state is not immune from the exercise of our jurisdiction in a case "in which rights in property taken in violation of international law are in issue." 28 U.S.C. § 1605(a)(3). This exception is based upon the general presumption that states abide by international law and, hence, violations of international law are not "sovereign" acts.

West's claim here is that the conversion of the dollar accounts was an unlawful taking. Because the claim is substantial and non-frivolous, it provides a sufficient basis for the exercise of our jurisdiction, even though we ultimately rule against the plaintiffs on the merits. *See Bell v. Hood,* 327 U.S. 678, 683, 66 S.Ct. 773, 776, 90 L.Ed. 939 (1946).[3] *See also* Restatement of Foreign Relations Law of the United States (Revised), § 455 comment c (Tent.Draft No. 2, 1981) [Hereinafter Restatement, draft number, and date] (28 U.S.C. § 1605(a)(3) applies to "claims to compensation for taking").

Thus, the district court and this court properly have jurisdiction over this action consistent with FSIA.[4]

## II. Securities Claim

### A. *Applicable Law*

■ West contends that the certificates of deposit he purchased should be considered to be "securities" within the meaning of federal securities law. Preliminarily we note that "the nature of an instrument is to be determined at the time of issuance, not at some subsequent time." *Great Western Bank & Trust v. Kotz,* 532 F.2d 1252, 1255 (9th Cir.1976). The plaintiffs argue that because the defendant banks did not comply with the federal regulatory scheme governing securities, they are liable for the losses occasioned by the devaluation of Mexican pesos and the losses associated with the conversion of the dollar accounts to pesos.

The defendants assert that this Court's decision in *Wolf v. Banco Nacional de Mexico, S.A. (Banamex),* 739 F.2d 1458 (9th Cir.1984), *cert. denied,* 469 U.S. 1108, 105 S.Ct. 784, 83 L.Ed.2d 778 (1985), controls the disposition of this claim. That case was based upon the Supreme Court's decision in *Marine Bank v. Weaver,* 455 U.S. 551, 102 S.Ct. 1220, 71 L.Ed.2d 409 (1982), which held that certificates of deposit issued by a domestic bank were not securities within the meaning of 15 U.S.C. § 78c(a)(10) and thus were exempt from the strict requirements of that regulatory scheme. The Court in *Weaver* noted that "the holder of an ordinary long-term debt obligation assumes the risk of the borrower's insolvency," whereas the "purchaser of a certificate of deposit is virtually guaranteed payment in full" by the scheme of federal banking statutes. 455 U.S. at 558, 102 S.Ct. at 1224. Because holders of certificates of deposit were "abundantly protected" against the risk that a bank would become insolvent, those financial instruments were held not to be "securities". 455 U.S. at 559, 102 S.Ct. at 1225.

---

**3.** The "substantiality" requirement has been questioned. *See Rosado v. Wyman,* 397 U.S. 397, 404, 90 S.Ct. 1207, 1214, 25 L.Ed.2d 442 (1970) (calling it "a maxim more ancient than analytically sound").

**4.** The FSIA exceptions serve to grant article III "arising under" jurisdiction. *Verlinden,* 461 U.S. 480, 103 S.Ct. 1963. Here, both claims fall within such exceptions. Thus, we need not reach the issue whether each claim must qualify independently under a statutory exception to FSIA or whether if one claim qualifies, jurisdiction exists over related claims as well. *Cf. Northern Pipeline Construction Co. v. Marathon Pipe Line Co.,* 458 U.S. 50, 102 S.Ct. 2858, 75 L.Ed.2d 785 (1982); *United Mine Workers v. Gibbs,* 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966).

Our decision in *Wolf* was based primarily on the "insolvency protection" provided by the system of Mexican regulation governing the operation of its banks. Briefly, that system included: 1) supervision of banks by Banco de Mexico, the National Banking Commission, and the Ministry of Public Finance and Public Credit; 2) paid-in capital and reserve requirements; 3) authority of the National Banking Commission over advertising; 4) requirements for annual audits and for submission of monthly financial statements to the National Banking Commission; and 5) "preferential" legal status for claims against insolvent banks. We also considered the fact that no Mexican bank had failed in fifty years. Accordingly, we held that "[t]he depositors in a Mexican bank ... have been *'virtually guaranteed'* of repayment in full to the same degree as those in United States banks...." 739 F.2d at 1463 (emphasis added). Thus, the certificates of deposit were held not to be "securities." In reaching our conclusion, we said that "[w]hether a bank's certificate of deposit is a security surely cannot turn on the currency with which it is purchased or in which it is payable." *Id.* at 1462.

In *Wolf,* "it was *conceded* that the Mexican government's regulation ... provides ... certificate holders the same degree of protection against insolvency as does the federal system in this country." *Id.* at 1463 (emphasis added). Here, plaintiffs not only make no similar concession but vigorously challenge the conclusion reached in *Wolf.* They claim that while on paper the regulatory structure may provide adequate protection, Mexican officials are neither complying with nor enforcing their own laws. Thus, they say, there is in fact no "insolvency protection" afforded under the Mexican regulatory system. According to the plaintiffs, these circumstances render our holding in *Wolf* inapplicable.

West does not seek relief under Mexican law for the action of government officials in violating their own laws; rather, he contends that the officials' conduct is relevant in determining the question of the actual protection afforded to investors under the regulatory regime. According to the plaintiffs, if the scheme of regulation *as applied* does not satisfy the insolvency protection test, the certificates of deposit should be considered to be "securities."

We held in *Wolf* that U.S. law was applicable in determining the nature of the instruments in question. A necessary incident to that holding is that U.S. law is applicable to any examination of the factual predicates to our legal conclusions— here, the manner in which the Mexican regulations are being administered or enforced. *Cf. Fiske v. Kansas,* 274 U.S. 380, 385–86, 47 S.Ct. 655, 656–57, 71 L.Ed. 1108 (1927) ("where a conclusion of law as to a Federal right and a finding of fact are so intermingled as to make it necessary, in order to pass upon the Federal question, to analyze the facts," independent review is appropriate). Accordingly, U.S. law would be applicable to the question whether Mexican officials in fact are violating their own law in the nonenforcement or misenforcement of the regulatory structure and, derivatively, to the question whether such conduct would require a reconsideration of our holding in *Wolf* that certificates of deposit in Mexican banks are virtually guaranteed of repayment. However, the scope of our inquiry into the actions of foreign governments is limited by the act of state doctrine. In this case, that doctrine prevents us from scrutinizing the alleged non-feasance or misfeasance of the Mexican officials charged with enforcing their country's banking laws.

### B. Act of State Doctrine

The act of state doctrine is a combination justiciability and abstention rule developed in pre-*Erie* days and reaffirmed in *Banco Nacional de Cuba v. Sabbatino,* 376 U.S. 398, 84 S.Ct. 923, 11 L.Ed.2d 804 (1964). It prohibits U.S. courts from reaching the merits of an issue—even though we otherwise have jurisdiction—in order to avoid embarrassment of foreign governments in politically sensitive matters and interference with the conduct of our own foreign policy. *See e.g., International As-*

sociation of Machinists & Aerospace Workers, (IAM) v. Organization of Petroleum Exporting Countries (OPEC), 649 F.2d 1354 (9th Cir.1981), cert. denied, 454 U.S. 1163, 102 S.Ct. 1036, 71 L.Ed.2d 319 (1982). The classic statement of the doctrine is found in Underhill v. Hernandez, 168 U.S. 250, 18 S.Ct. 83, 42 L.Ed. 456 (1897):

> Every sovereign State is bound to respect the independence of every other sovereign State, and the courts of one country will not sit in judgment on the acts of the government of another done within its own territory.

Id. at 252, 18 S.Ct. at 84. The public capacity of the actors involved in the suit or the governmental acts of a nondefendant state (if called into question) may serve to trigger the act of state doctrine. See, e.g., DeRoburt v. Gannett Co., Inc., 733 F.2d 701 (9th Cir.1984), cert. denied, 469 U.S. 1159 105 S.Ct. 909, 83 L.Ed.2d 923 (1985). In general, "[w]hen the causal chain between defendant's alleged conduct and plaintiff's injury could not be determined without an inquiry into the motives of the foreign government, the defense has been successful...." Restatement, § 469, comment 7 (Tent.Draft No. 7, 1986).

■ The plaintiffs here challenge the compliance of Mexican officials with enforcement provisions of the Mexican regulatory scheme. The acts or omissions of the sovereign is the determinative issue on this claim.[5] The evaluation by one sovereign of foreign officers' compliance with their own laws would, at least in the absence of the foreign sovereign's consent, intrude upon that state's coequal status. See, e.g., Clayco Petroleum Corp. v. Occidental Petroleum Corp., 712 F.2d 404, 406–07 (9th Cir.1983), cert. denied, 464 U.S. 1040, 104 S.Ct. 703, 79 L.Ed.2d 168 (1984). Thus, further inquiry into the actual operation of the nationalized Mexican banking system to the extent that it implicates the non-compliance of officials with their own laws is barred under the act of state doctrine.[6] See, e.g., Timberlane Lumber Co. v. Bank of America National Trust & Savings Ass'n, 549 F.2d 597 (9th Cir.1976).

■ Wolf requires that in order for a foreign bank offering certificates of deposit to be exempt from the registration and disclosure requirements of U.S. securities law, the foreign government must have adopted a comprehensive regulatory scheme governing banking operations that "virtually guarantees" repayment to purchasers of such certificates. Although "the trial court must hear evidence on the degree of protection that structure offers a depositor against insolvency," 739 F.2d at 1463, it may not examine the actual operations of the regulatory system to the extent that such inquiry would directly implicate the failure (whether willful or negligent) of officers of the foreign state to enforce their own laws, at least in the absence of consent of the foreign sovereign. As a matter of comity, we presume that Mexican officials are acting in a manner consistent with the requirements of Mexican law.[7]

---

5. We also note that the noncompliance of Mexican officials with their own law is certainly not a "commercial activity" within the meaning of the plurality opinion in Alfred Dunhill of London, Inc., v. Republic of Cuba, 425 U.S. 682, 695–706, 96 S.Ct. 1854, 1861–66, 48 L.Ed.2d 301 (1976). The Dunhill plurality argued that a "commercial activities" exception exists to the act of state doctrine. We do not need to reach that issue here.

6. Accordingly, the district court's ruling that additional discovery was not required to develop these facts in the motion for summary judgment is sustained. While the nonmoving party should receive "time for discovery necessary to develop facts justifying opposition to the motion", Grove v. Mead School District No. 354, 753 F.2d 1528, 1532 (9th Cir.), cert. denied, —— U.S. ——, 106 S.Ct. 85, 88 L.Ed.2d 70 (1985), the act of state doctrine bars further factual development in this case.

7. Our dictum in Wolf is not to the contrary. There, we stated that "where a foreign government's regulatory structure is implicated, the trial court must hear evidence on the degree of protection that structure offers a depositor against insolvency." 739 F.2d at 1463. We did not intend to imply that a party could challenge the honesty or effectiveness of the foreign officials or introduce evidence seeking to establish

Here, the only question as to the adequacy of the Mexican regulatory structure is the compliance of Mexican officials with the requirements of Mexican law. Because our inquiry into the foreign officials' actions is barred by the act of state doctrine, our holding in *Wolf* that the certificates of deposit issued by Mexican banks are not "securities" is applicable. Since the certificates were not subject to the requirements of U.S. securities law, the plaintiffs cannot prevail on their securities law claim.

### III. Takings Claim

West claims that the 'conversion' of his dollar-denominated certificate of deposit to pesos at a rate of exchange specified by the government—a rate less than the market rate of exchange—was a taking of his property in violation of international law. This is an expropriation claim. Before reaching the merits of that claim, we must again consider the applicability of the act of state doctrine and determine whether it is permissible for us to examine the challenged actions of the Mexican government.

### A. Act of State and the Hickenlooper Amendment

■ Ordinarily, the act of state doctrine would be applicable here for all the reasons discussed in the "securities claim" section *supra*. However, Congress has adopted a specific statutory provision requiring federal courts to examine the merits of controversies involving expropriation claims. The so-called Second Hickenlooper Amendment, 22 U.S.C. § 2370(e)(2) (1982), overrides the judicially developed doctrine of act of state. Hickenlooper was passed in response to the Supreme Court's decision in

*Banco Nacional de Cuba v. Sabbatino,* 376 U.S. 398, 84 S.Ct. 923, 11 L.Ed.2d 804 (1964), which barred adjudication of an expropriation claim on act of state grounds. The amendment states in part:

> [N]o court in the United States shall decline on the ground of the federal act of state doctrine to make a determination on the merits giving effect to the principles of international law in a case in which a claim of title or other rights to property is asserted by any party ... based upon (or traced through) a confiscation or other taking ... by an act of that state in violation of the principles of international law, including the principles of compensation....

22 U.S.C. § 2370(e)(2). When Hickenlooper governs, courts are barred from invoking the judicially created doctrine under which we refrain from consideration of cases involving acts of foreign governments or foreign officials.[8]

Defendants argue that Hickenlooper is inapplicable because rights arising out of ownership of certificates of deposit are contractual, and hence not 'tangible property' which can be taken by expropriation within the meaning of the amendment. Although this proposition finds support in case law, *e.g., French v. Banco Nacional de Cuba,* 23 N.Y.2d 46, 295 N.Y.S.2d 433, 242 N.E.2d 704 (1968), it is based largely upon an overly formalistic attachment to private law categories and is contrary to the motivating policies of the Hickenlooper Amendment.

---

that they were not executing their country's laws. Under *Clayco,* any such challenge is barred. *Clayco Petroleum Corp. v. Occidental Petroleum Corp.,* 712 F.2d 404, 406–07 (9th Cir. 1983), *cert. denied,* 464 U.S. 1040, 104 S.Ct. 703, 79 L.Ed.2d 168 (1984). Of course, a showing can be made either that the structure may not address the depositor's problems or that even with the regulatory system, banks nonetheless fail with some regularity.

8. Congress's ability to override the act of state doctrine is directly related to the underpinnings of that doctrine. In *Sabbatino,* the Supreme Court explained that the act of state doctrine

was grounded largely upon "the competence and function of the Judiciary ... in ordering our relationships with other members of the international community." 376 U.S. at 425, 84 S.Ct. at 939. In addition to concerns of institutional competence, the Court indicated that the "absence of a treaty or other unambiguous agreement regarding controlling legal principles" gave it pause. *Id.* at 428, 84 S.Ct. at 940. In the context of expropriation claims, Congress has determined both that the courts are competent to resolve such claims (unless the President specifically directs otherwise in a particular case, 22 U.S.C. § 2370(e)(2)) and that the relevant content of international law is clear.

Defendants' construction would unnecessarily restrict the scope of Hickenlooper. As the District of Columbia Circuit has noted, the "broad, unqualified language of the carefully drafted amendment" should not be undermined by the importation of external constraints on interpretation. *Ramirez de Arellano v. Weinberger*, 745 F.2d 1500, 1542 n. 180 (D.C.Cir.1984) (en banc), *vacated and remanded because of subsequent legislation*, 471 U.S. 1113, 105 S.Ct. 2353, 86 L.Ed.2d 255 (1985). The legislative history to Hickenlooper supports the rejection of a constricted interpretation and makes it clear that the protection afforded U.S. investments was to be broad in scope:

> The sponsors of the amendment referred to it as the "Rule of Law" amendment; they viewed it as authorizing courts to apply established law [in] suits challenging expropriations. Congressional intent to overturn *Sabbatino* was never limited to a single narrow class of cases. The purposes of the amendment include the promotion and protection of United States investment in foreign countries (which characteristically has always principally been land, minerals, and large fixed immovables), and securing the right of a property holder to a court hearing on the merits.

*Id. See also Foreign Assistance Act: Hearings on H.R. 7750 Before the Committee on Foreign Affairs*, 89th Cong., 1st Sess. 592, 607–10 (1965).

Moreover, the tangible/intangible characterization of property interests, urged by the defendants, is a distinction without a difference. This distinction is not generally recognized in international, federal, or state law. *See* Christie, *What Constitutes a Taking of Property Under International Law?*, 38 Brit.Y.B.Int'l L. 307, 318–19 (1964) ("contract and many other so-called intangible rights can, under certain circumstances, be expropriated"); *Oakland v. Oakland Raiders (Raiders I)*, 32 Cal.3d 60, 68, 183 Cal.Rptr. 673, 678, 646 P.2d 835,

840 (1982) (at least for "eminent domain purposes, neither the federal nor the state Constitution distinguishes between property which is real or personal, tangible or intangible").

Although the certificates of deposit may be characterized as intangible property or contracts, they are "property interests" that are protected under international law from expropriation. For example, in its adjudication of disputes involving claims for compensation for alleged takings of property—bank deposits in Czechoslovakia—the Foreign Claims Settlement Commission observed that while "[t]he relationship between a depositor and bank arises only out of contract[,] . . . a contract right is property." *Panel Opinion No. 1, (revised)*, Fourteenth Semiannual Report to the Congress for the Period Ending June 30, 1961, 124, 125 (Foreign Cl. Settlement Comm'n) (footnote omitted). The Commission ruled that the "right to payment of [a] deposit is regarded as property" and provides a basis for an expropriation claim. Here, we have citizens who purchased certificates of deposit. Such contracts are properly understood as investments and are therefore the type of "property" that Hickenlooper sought to protect. *Cf. Kaiser Aetna v. United States*, 444 U.S. 164, 175, 100 S.Ct. 383, 390, 62 L.Ed.2d 332 (1979) (some of the factors to be considered in determining whether government action effected a "taking" of property are "the economic impact of the regulation, its interference with reasonable investment backed expectations, and the character of the governmental action").

In sum, the rights arising from a certificate of deposit are "rights to property" capable of being expropriated by foreign states under international law within the meaning of Hickenlooper. We reject the construction suggested by the defendants and hold that the "tangibleness" of property is not the dispositive factor.[9] Accordingly, the amendment is applicable and

---

9. We do not intend to suggest by our discussion in the text that every contract claim is encom-

passed by the protections of Hickenlooper.

we are free to adjudicate the plaintiffs' claims on the merits.

## B. *The Merits of the Takings Claim*

 The plaintiffs claim that the institution of exchange controls by Mexico constituted a taking of property in violation of international law. Determining whether an action by a government is a legitimate exercise of the police power in the regulation of its internal affairs as opposed to a taking of property can pose particularly difficult problems. Valid expropriations must always serve a public purpose; that public purpose in some cases may be so strong as to render lawful what otherwise might constitute a "taking." As one commentator notes:

> The conclusion that a particular interference is an expropriation might also be avoided if the State whose actions are the subject of complaint had a purpose in mind which is recognized in international law as justifying even severe, although by no means complete, restrictions on the use of property.... [For example,] changes in the value of a State's currency ... will ... serve to justify actions which because of their severity would not otherwise be justifiable.

Christie, 38 Brit.Y.B.Int'l L. at 331–2 (footnote omitted).

 A state has a strong interest in its monetary policy. Under international law, the legislature generally is free to impose exchange controls. "Customary international law does not normally fetter the municipal legislator's discretion in these matters or characterize his measures as an international wrong." F.A. Mann, The Legal Aspect of Money 465 (4th ed. 1982).[10]

According to the plaintiffs, the Mexican government "eliminated" their dollar accounts and this action combined with the conversion of those accounts at a specified rate of exchange, violated international law. Plaintiff challenges the following governmental edicts:

1. On August 12, 1982, the Mexican Ministry of Treasury and Public Credit issued a decree stating:

> Bank deposits denominated in foreign currency, made within or outside the Republic to be returned in this [Republic], shall be paid by delivering an equivalent amount in national currency at the rate of exchange prevailing at the place and on the date in which such payment is made.

Reglas para el pago de depositos bancarios denominados en moneda extranjera, Diaro Official 2, 3 (Aug. 13, 1982) (record translation).

2. On September 1, 1982, Mexico nationalized its banks because of "the economic crisis from which Mexico is presently suffering ... which in part has been aggravated by the lack of direct control of all of the credit system." Decreto que establece la nacionalizacion de la Banca Privada, D.O. 3 (Sept. 1, 1982) (record translation).

3. A separate decree issued that day stated that "[u]pon maturity, all bank deposits in foreign currency will be eliminated, and will be repaid at the rate of exchange that on that date has been set by the Banco de Mexico." Decreto que establece el control generalizado de cambios, D.O. at 8 (record translation).

Plaintiffs claim that the institution of these measures effected a confiscation of their dollar accounts.

Actions such as those taken by the Mexican government generally do not constitute takings under international law. Professor Mann, a leading expert, has stated the basic rule that "[e]xpectations relating to the continuing intrinsic value of a currency ... suffer from the 'congenital infirmity' that they may be changed by the competent legislator." F.A. Mann, *supra*, at 474 (quoting *Norman v. Baltimore & Ohio*

---

**10.** Throughout the proceeding the parties have treated international law as applicable. We believe their choice of law is correct. It is appropriate to look to international law when determining whether the institution of exchange control regulations constitutes a "taking" for purposes of FSIA. We note, however, that in ascertaining the content of international law, we may look to various sources of law, including United States law.

*Railroad Co.*, 294 U.S. 240, 308, 55 S.Ct. 407, 416, 79 L.Ed. 885 (1935)) (footnote omitted). Moreover, as the New York Court of Appeals noted in *French*, "[a] currency regulation which alters either the value or character of the money to be paid in satisfaction of contracts is not a 'confiscation' or 'taking.'" 23 N.Y.2d at 55, 295 N.Y.S.2d 433, 242 N.E.2d 704. We also note that the Director of the Legal Department of the International Monetary Fund (IMF) has concluded that these exchange controls "do not violate and are not inconsistent with the Articles of Agreement of the International Monetary Fund." *See Callejo*, 764 F.2d 1101 at 1119–21 (5th Cir. 1985) (discussing IMF's letter and the extent of deference appropriate to IMF determinations). Mexico's institution of exchange controls was an exercise of its basic authority to regulate its economic affairs.

We cannot conclude that the program of exchange controls instituted by Mexico was unlawful. Mexico's actions as they affected the dollar accounts fall within the rule enunciated by the Restatement (Second) of Foreign Relations Law of the United States § 198 (1965). Comment b to this section states:

> [A] requirement that foreign funds held within the territory of the state be surrendered against payment in local currency at the official rate of exchange is not wrongful under international law, even though the local currency is less valuable on the free market than the foreign funds surrendered.

As the Foreign Claims Settlement Commission observed, "[i]t is a recognized rule of international law that a state has the right to make every effort to stabilize its currency in time of financial stress." *In the Matter of Karolin Furst*, No. CZ–14, Fourteenth Semiannual Report 116, 117. Here, although the plaintiffs did indeed suffer losses as a result of the institution of ex-

change controls, these losses were not occasioned by a "taking" of their property as understood by international law. *Cf.* Panel Opinion No. 1, at 126 (Foreign Cl. Settlement Comm'n) ("when [a contract right] is lost or injured as a consequence of lawful governmental action not a taking, the law affords no remedy.") (citation omitted).

 There are, however, some limits to the costs that a state may impose on foreign investors when it institutes exchange controls. International law requires that aliens not be discriminated against or singled out for regulation by the state. *See* Christie, 38 Brit.Y.B.Int'l L. at 332. As Professor Mann summarizes, "there comes a point when the exercise of [the state's] discretion so unreasonably or grossly offends against the alien's right to fair and equitable treatment, or so clearly deviates from customary standards of behavior, that international law will intervene." F.A. Mann, *supra* at 477. Mexico did not abuse its discretion here.

Finally, plaintiffs advance the claim that the alleged confiscation was violative of international law because they did not receive compensation equivalent to the full market value of their property. We agree with plaintiffs that compensation is ordinarily linked to the legality of a taking. An otherwise valid taking is illegal without the payment of just compensation. This position is articulated in a letter from Secretary of State Cordell Hull to the Mexican Ambassador in 1940:

> [T]he right to expropriate property is coupled with and conditioned on the obligation to make adequate, effective, and prompt compensation. The legality of an expropriation is in fact dependent upon the observance of this requirement.

3 Hackworth, Digest of Int'l L. 662 (1942). While there may be exceptions to this principle,[11] generally states have the obligation

---

11. For example, many scholars have argued that this requirement does not apply when a state expropriates agricultural land for purposes of redistributive reform, *see, e.g.,* 1 Oppenheim, International Law 352 (8th ed. Lauterpacht 1955). *Cf. Asociacian de Reclamantes v. United*

*Mexican States,* 561 F.Supp. 1190, 1198 (D.D.C. 1983) (ruling that court did not have jurisdiction under 28 U.S.C. § 1605(a)(5) because the "highest authorities" of government failed to compensate plaintiffs for land grant claims and such claims "raise substantial and serious ques-

to make "appropriate" compensation. Restatement, § 712, comment c (Tent.Draft No. 7, 1986). *See also Banco Nacional de Cuba v. Chase Manhattan Bank,* 658 F.2d 875, 887–93 (2d Cir.1981) (discussing the multiple positions in international law on appropriate standards of compensation). Here, however, as we have concluded earlier, there was simply no taking. Thus, no question as to the adequacy of compensation arises.

Even if there had been a taking of plaintiffs' property, we would be reluctant to adopt the effective result of their position here: a judicially established guarantee of the full repayment of investments abroad in certificates of deposits notwithstanding the actions of foreign governments attempting to control their own economies. The courts of this country should not operate as an international deposit insurance company, hauling foreign sovereigns before us whenever disgruntled investors so desire. West and his fellow plaintiffs chose to purchase both dollar and peso certificates of deposit because of the extraordinary rates of return. The actions of the government of Mexico and the losses they occasioned were within the purview of the risks associated with those potentially extraordinary returns. The judgment of the District Court is

AFFIRMED.

tions of fiscal policy, and the allocation of limited resources.") (footnote omitted), *aff'd on other grounds,* 735 F.2d 1517 (D.C.Cir.1984), *cert. de-* *nied,* 470 U.S. 1751, 105 S.Ct. 1751, 84 L.Ed.2d 815 (1985).